**Phyllis F. BORRELL, Appellant,**

v.

**UNITED STATES INTERNATIONAL COMMUNICATIONS AGENCY, et al.**

**No. 81–1919.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 6, 1982.

Decided June 22, 1982.

Courts Oulahan, Washington, D. C., with whom Phyllis Diamond, Washington, D. C., was on the brief, for appellant.

Diane M. Sullivan, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed. Royce O. Lamberth, Kenneth M. Raisler and Whitney Adams, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Mark D. Roth, Washington, D. C., with whom Beth S. Slavet, Washington, D. C., were on the brief, for amicus curiae urging reversal.

Before ROBINSON, Chief Judge, WALD, Circuit Judge, and LARSON,* United States Senior District Judge for the District of Minnesota.

WALD, Circuit Judge:

This is an appeal from a decision of the district court, dismissing a complaint brought by a former probationary employee of the United States International Communications Agency ("ICA"). Dr. Phyllis F. Borrell, plaintiff-appellant, charged that she was discharged in reprisal for her whistleblowing on official violations of law, waste and abuse of authority. Her claim was based upon Title I, section 101(a) of the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 2302(b)(8)(A), which prohibits an official from taking an adverse personnel action against an employee as a reprisal for:

(A) a disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences—

(i) a violation of any law, rule, or regulation, or

(ii) mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs

. . . .

In addition, Borrell alleged that her discharge violated the first and fifth amendments to the Constitution in that it abridged her free speech rights and deprived her of liberty without due process of law. Borrell also asserted claims under the Privacy Act and the Freedom of Information Act ("FOIA"). Her claim under the Privacy Act was that an "accurate, timely, and complete" record of her job performance was not maintained, as required by 5 U.S.C. § 552a(g)(1)(C); her claim under FOIA requested the production of certain documents by the ICA. The district court dismissed all of the claims: the CSRA claim was dismissed for want of jurisdiction; the constitutional claims were denied because the court found that Borrell's discharge was "not tainted by constitutional improprieties" and that Borrell was not deprived of liberty or property;[1] the Privacy Act claim was rejected because the information challenged was neither "disseminated to outside persons nor . . . concern[ed] matters outside the scope of her employment"; and the FOIA claim was dismissed because "all of the requested items under FOIA were responsibly and legally responded to" with one exception, which the court found was *de minimis.* Appellant's Appendix ("A.A.") A–46–50 (memorandum opinion). We uphold the district court's ruling on the CSRA and FOIA claims, but *remand* because of the inadequacy of the district court's findings on the constitutional and Privacy Act claims.

## I. BACKGROUND

Dr. Phyllis F. Borrell was hired by ICA as a probationary employee, GS–12 on April 23, 1979. A.A. C-Plaintiff's Exhibit ("PX") 1. She was assigned to the Projects Branch of the Exhibits Development and Production Division in the Exhibits Service ("Service") of the agency, where she worked for several senior officials. She was, apparently, one of the first outside professionals to work in that Service for some time.

By the summer of 1979, appellant became aware of and started to complain to fellow employees about certain practices in the agency which she believed constituted violations of law and regulations, mismanagement, gross waste of funds and abuse of authority. A.A. A–25. Specifically, she

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The complaint did not assert deprivation of property without due process. The fifth amendment claim was limited to a claim of denial of liberty. *See* Appellant's Appendix (A.A.) A–29.

complained about allegedly improper use of repeatedly extended purchase order contracts for two vendors working on the premises of ICA, unnecessary and wasteful travel, use of government time by one official for private real estate transactions, and the improper hiring of the spouse of a senior ICA employee.[2] Until she began to complain, there had been no complaints from her superiors about her work performance—indeed, in June she was told that she had an "excellent" probability of continued employment.

From early August until mid-October, appellant worked for Ms. Gail Becker, the only one of four supervisors for whom appellant worked to issue her a less than satisfactory work rating. *See* A.A. B (Trial Transcript)—Meade 406–07; Starzynski 511–13; Gerran 1015–16. On October 22, 1979, Becker sent a memorandum to Richard Suib, Chief of the Exhibits Development and Project Division, requesting that Borrell be *transferred*. Government's Appendix ("G.A.") 2–3. Three days later, appellant was informally advised that Suib had decided to recommend her *discharge*. A.A. B–1405–06. On November 14, 1979, appellant was officially notified of her discharge, effective thirty days thereafter. G.A. 15–16. The reasons provided were:

a) an inability to adapt to the overall work program in the Exhibits Service, and b) an inability to meet deadlines primarily related to purchase order contracts.

*Id.* at 15.

On December 19, 1979, Borrell petitioned the Office of Special Counsel ("OSC") of the Merit Systems Protection Board ("MSPB") to investigate her discharge pursuant to 5 U.S.C. § 1206(a), contending that it was in reprisal for whistleblowing—a prohibited personnel practice under 5 U.S.C. § 2302(b)(8). The OSC denied a 5 U.S.C. § 1208 request for a stay of termination; however, the district court, *per* Parker, J., in response to Borrell's complaint for declaratory and injunctive relief, postponed the effective date of her termination until January 9, 1980. A.A. A–1–10. On January 10, 1980, while Borrell's petition was pending before the OSC, Judge June Green dismissed her complaint. A.A. A–13. Judge Green held that the district court lacked subject matter jurisdiction because appellant had "failed to exhaust the administrative remedies available to her from the MSPB and its Office of Special Counsel." *Id.* at 15. This court initially dismissed appellant's appeal from that order, but on rehearing vacated its dismissal order and remanded to the district court citing an OSC letter, which stated, in relevant part:

The Civil Service Reform Act of 1978 does not require Federal employees to submit a complaint or allegation to this Office. Whether the Special Counsel

---

2. An agency investigation, initiated in December, 1979, in response to appellant's allegations, *see* A.A. C–PX 39 (agency audit), indicated a "need to tighten up some management and contracting procedures within the Exhibits Service[.]" A.A. B–1553. During trial, one of the government's own witnesses admitted:

.... I have to say something I probably shouldn't say. The Exhibits Service is the most unique operation, probably in the whole U.S. Government.

It operates unlike anything else operates. These men have got to create something where nothing exists. They spend about ten times as much money as they are budgeted for.

They go out and borrow and make deals and cut corners and hack their way through impossible situations. They are not supported, directed, buttressed or watched. They can't be.

They are all over the world, operating on their own and they have done, in my view, an absolutely incredible job.

The fact that we have not had really serious trouble in the Exhibits Division is almost a miracle and, frankly, I think that most of these allegations, we were very lucky to get away—if every one of them are right—with anything quite this small, given the state, size, pressure and difficulty these people deal with.

As I say, in the ten years, we have had about two or three such charges that seemed to be merited and they are all of the same general scope as this. And I am, frankly, surprised that we haven't had some really terrible things happen.

*Id.* at 1555–56.

seeks a stay of a personnel action before the Merit Systems Protection Board is purely discretionary with the Special Counsel, and in any event the employee is not a party to the proceeding. The nature of the inquiry and investigation conducted by the Special Counsel upon receipt of a complaint is also discretionary. Additionally, an employee does not have any appeal rights to the Merit Systems Protection Board, from a decision or determination made by the Office of the Special Counsel. Nor is there any provision for judicial review of a Special Counsel determination.

It should further be noted that if the Special Counsel files a request for an order of corrective action with the Merit Systems Protection Board pursuant to 5 U.S.C. 1206(c)(1)(B), the affected employee is not a party unless the Board permits him to intervene.

Moreover, cases which the Special Counsel has closed are frequently reopened based on new information received from a complainant or a third party. The only statutory time limit imposed on the Special Counsel relates to referral of certain whistleblower allegations to agencies pursuant to 5 U.S.C. 1206(b)(3). Thus, in many instances it would be extremely difficult to determine when the process in this Office is to be regarded as concluded.

*Id.* at 17–18.

On remand, after a trial before the court, Judge Green dismissed the action. *Id.* at 45. Meanwhile, the OSC pursued Borrell's allegations and on July 21, 1980 terminated the investigation, finding "nothing to substantiate the allegation [ ]" of retaliation for whistleblowing. *Id.* at 20. After an investigation, the OSC concluded that "Borrell's termination was based on certain aspects of her performance which were determined to be less than satisfactory by her supervisors." [3] The district court's dismiss-

al of Borrell's whistleblowing allegation was based upon its determination that a probationary employee had no implied private right of action under the CSRA to challenge a dismissal in a separately initiated court action. The district court stated that appellant had "no right to judicial review of personnel actions not found by its Special Counsel to involve prohibited personnel actions." *Id.* at 48. The court also rejected appellant's constitutional claims: on the "substantial factual issue . . . as to whether [Borrell's] termination was improperly motivated in retaliation for [her] constitutionally protected exercise of free speech," the court held "that her dismissal was not tainted by unconstitutional improprieties." *Id.* at 49. The court dismissed the FOIA claim, finding that appellant's requests had been fulfilled. *Id.* at 50. Finally, the district court rejected the Privacy Act claim because Borrell was not damaged by any inaccurate information in her file—the challenged "statements have not been disseminated to outside persons nor did they concern matters outside the scope of . . . employment." A.A. A–49.

## II. ANALYSIS

### A. *CSRA Claim*

The district court ruled that it lacked jurisdiction in a separately initiated court action to retry the OSC's finding that appellant's discharge was based upon unsatisfactory performance rather than any whistleblowing activities. Appellant, on the other hand, contends that although the CSRA nowhere explicitly provides for a private right of action in district court to enforce its prohibition against reprisal for whistleblowing, such a right can and must be "implied." Appellant reasons that by enacting the CSRA Congress sought "to achieve a Federal work force administered 'consistent with merit system principles and free from prohibited personnel practices,' 5 U.S.C.

---

**3.** A.A. A 20. The OSC also stated:

This letter . . . should not be construed as an adjudication by this Office of any matters investigated. No adjudication has been made of any matter you may otherwise pur-

sue under any administrative appeal or complaint procedure which may be provided under law, rule or regulation.
*Id.* at 20.

§ 1101," Appellant's Brief at 15; nontenured, as well as tenured, employees were meant to be protected from prohibited personnel practices, *id.* at 26; the right to petition the OSC to investigate and to seek correction of prohibited personnel practices—the only explicit remedy provided probationary employees—is patently inadequate; and in the absence of a post-investigation prosecution by the OSC the probationary employee will be left without remedy. In sum, Congressional intent will go uneffectuated if the decision of the district court is upheld. *Id.* at 21–29.

■ Whether there is an implied right of action under the CSRA for purported whistleblowers is primarily a question of legislative intent. In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court announced a four-part test to determine whether a non-express private right of action can be inferred from a statute:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39 [36 S.Ct. 482, 484, 60 L.Ed. 874] (1916) (emphasis supplied)— that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e.g., National Railroad Passenger Corp v. National Assn. of Railroad Passengers*, 414 U.S. 453, 458, 460 [94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646] (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e.g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 423 [95 S.Ct. 1733, 1740, 44 L.Ed.2d 263] (1975); *Calhoon v. Harvey*, 379 U.S. 134 [85 S.Ct. 292, 13 L.Ed.2d 190] (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S.Ct. at 2087 (emphasis in original). Legislative intent has proved to be the preeminent test. In *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Court stated that "before concluding that Congress intended to make a remedy available to a special class of litigants, a court must clearly analyze the four factors that *Cort* identified as indicative of such an intent." *Id.* at 688, 99 S.Ct. at 1953; *see also id.* at 717–18, 99 S.Ct. at 1968 (Rehnquist, J., concurring), 740 (Powell, J., dissenting). Similarly, in *Touche Ross & Co. v. Reddington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Court held:

It is true that in *Cort v. Ash*, the Court set forth four factors that it considered "relevant" in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose, see 422 U.S., at 78 [95 S.Ct. at 2087]—are ones traditionally relied upon in determining legislative intent.

*Id.* at 575–76, 99 S.Ct. at 2488–2489. And in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court stated that "[t]he dispositive question remains whether Congress intended to create any such remedy." *Id.* at 24, 100 S.Ct. at 249. Finally, this term, in *Merrill Lynch v. Curran*, —— U.S. ——, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), and *Jackson Transit Authority v. Local Division 1285, Amalgamated Transit Union, AFL–CIO–CLC*, —— U.S. ——, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982), the Court again reiterated that the question of whether there was an implied right of action was one of legislative intent. *See also Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *Piper v. Chris-Craft*

*Indus.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (all finding no implied right of action).

 In enacting the CSRA, we find that Congress did not intend to create a private statutory right of action to enforce restrictions against reprisals for whistleblowing.[4] Although Congress sought to safeguard all employees, both tenured and non-tenured, from prohibited personnel practices and thereby to insure a "more effective civil service" for the public generally, it established in the Act a detailed enforcement scheme to effect its purpose. That scheme allows probationary employees such as appellant relief only through investigation and corrective action by the OSC. *See Wren v. Merit Systems Protection Board,*

618 F.2d 867, at 873 (D.C.Cir.1982) (hereinafter *Wren*). The OSC is authorized and *required* by the CSRA, 5 U.S.C. § 1206(a)(1), to investigate allegations of prohibited personnel practices to the extent necessary to determine whether there are reasonable grounds to believe the allegations. If the investigation results in a finding of prohibited personnel practice, the OSC may seek correction before the MSPB. 5 U.S.C. § 1206(c)(1)(A). The OSC may also seek an interim stay of a personnel action from the MSPB if it determines that there are reasonable grounds to believe that the action constitutes a prohibited personnel practice. 5 U.S.C. § 1208. In addition to OSC relief, *tenured* employees may also independently pursue a Chapter 77 appeal

4. Although the question of an implied right of action for a whistleblower under the CSRA is one of first impression for this court, the District Court for the District of Columbia has ruled on similar questions on several occasions. *See, e.g., Apodaca v. United States Government Printing Office,* No. 80–2978 (D.D.C. Sept. 16, 1981) (Obderdorfer, J.); *Brawner v. United States Department of the Navy,* No. 80–3195 (D.D.C. April 27, 1981) (Pratt, J.); *Cutts v. Ferris,* No. 80–1992 (D.D.C. July 29, 1981) (Gasch, J.); *Dearsman v. Kurtz,* No. 80–2023 (D.D.C. June 26, 1981) (Smith, J.); *Scarangella v. Schweiker,* No. 81–0744 (D.D.C. Aug. 7, 1981) (Parker, J.).

In support of her argument, appellant cites *Gilley v. United States,* 649 F.2d 449 (6th Cir. 1981). The question presented in that case was whether a district court could enjoin a transfer of a tenured employee or whether 5 U.S.C. § 1208, authorizing the OSC to seek a stay of any personnel action for fifteen days upon a determination of reasonable grounds to believe the action was taken as a result of a prohibited personnel practice, was the exclusive remedy. The court held:

> Though the Reform Act of 1978 represented a comprehensive overhaul of the federal civil system, we find no indication within the statutory language, or the legislative history, of an intent to deprive district courts of their traditional equitable powers. The plaintiff did not seek review of the refusal of the Special Counsel to seek a temporary stay on his behalf. The authority of the Special Counsel in this regard is purely discretionary and there is no statutory provision for review of the exercise of this discretion. What the plaintiff sought and received from the district court was traditional equitable relief in the form of an injunction to prevent immediate irreparable injury which he claimed he would suffer if the transfer order were carried out

prior to completion of administrative review of the action of the Bureau. This was an entirely different degree of judicial protection than that provided by the Act. The two avenues of relief are not mutually exclusive.

> In the absence of a clear showing of congressional intent to do so, courts will not infer that the enactment of a particular statute containing provisions for judicial review has the effect of withdrawing from the courts their traditional equitable powers. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). This rule is related to the more general "doctrine disfavoring repeals by implication . . . ." *TVA v. Hill,* 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978); *Morton v. Mancari,* 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974). We find no support for the argument that Congress intended to deprive district courts of their traditional power to prevent irreparable harm by providing for judicial review in another forum of final personnel actions and for limited temporary stays of administrative orders at the behest of an officer of the executive branch. Such a limitation on a long recognized power of the district courts could be found only in explicit language not present in the Reform Act.

*Id.* at 453. This case can, of course, be distinguished from *Gilley* because appellant here seeks ultimate resolution of the whistleblowing allegation rather than interim and extraordinary relief. However, we note that the All Writs Act, 28 U.S.C. § 1651(a), authorizes injunctive relief only in cases within the jurisdiction of the court. Thus to the extent the Sixth Circuit's reasoning relies upon the assumption that a private right of action under the CSRA exists, we decline to follow it. *But see* note 7 *infra.*

to the Board. 5 U.S.C. § 7701; *see Frazier v. Merit Systems Protection Board*, 672 F.2d 150 (D.C.Cir. 1982). In 5 U.S.C. § 7512, Congress explicitly provided that the limited definition of "employee," referring only to tenured employees, did *not* apply to OSC investigations and correction actions. Thus, we are unable to conclude from the statute that Congress intended to provide an independent judicial remedy to employees, probationary or tenured, to enforce the statutory prohibition against reprisal for whistleblowing activities. Although Congress intended to protect *all* whistleblowers,[5] the protection afforded probationary employees was limited to that available under 5 U.S.C. § 1206. Congress apparently wanted not only to provide an effective and expeditious process for investigating whistleblower allegations, but also to protect against abuse of that process to halt termination based on unsatisfactory job performance. *See Markup Session on S. 2460, Civil Service Reform Act* at 85–86 (Unpublished, May 22, 1978) (remarks of Senators Percy and Chiles). Judicial review of the OSC's decision not to investigate or to prosecute is limited, at most, to insuring compliance with the statutory requirements of an inquiry into employee allegations to the extent necessary to determine if the allegations are meritorious and of a brief statement of reasons for terminating an investigation. *See Wren* at 872–874. Our conclusion that no private right of action was intended by Congress is also based upon 5 U.S.C. § 7703, which provides for judicial review of adverse agency appeals *exclusively* in the courts of appeals or Court of Claims, except in cases involving claims of discrimination under Title VII, the Age Discrimination in Employment Act or the Equal Pay Act. From this we surmise that Congress did not mean to allow the district courts any extensive supervisory jurisdiction over the way in which the CSRA's mandates are enforced.

In sum, we cannot accept appellant's arguments in support of an implied right of action under the CSRA. We think Congress meant to establish the OSC as an exclusive avenue of relief to probationary employees alleging prohibited personnel practices under the CSRA.

Our inquiry does not end at that point, however. The prohibited personnel practice of retaliation against whistleblowers may also violate first amendment constitutional rights. Therefore we must consider whether petitioner's action in the district court based upon constitutional claims was justifiably dismissed.[6]

## B. *Constitutional Claims*

Borrell alleged that the ICA's decision to discharge her abridged her "freedom

---

5. We note that to the extent the district court's opinion can be read to require a whistleblower to complain to superiors rather than colleagues, we disagree. The MSPB's own definition of whistleblower does not adopt such a limited view.

"Whistleblower" means a present or former Federal employee or applicant for Federal employment who discloses information he reasonably believes evidences a violation of any law, rule or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial or specific danger to public health or safety, if the disclosure is not specifically prohibited by statute and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs. A protected disclosure may be oral or written and to any person within or outside the agency. Disclosure of information to the Special Counsel, agency Inspector General, or other employee designated by the agency head to receive such infor-

mation is protected even if the disclosure would otherwise be prohibited by statute or is otherwise required by Executive order to be kept secret. Where the information disclosed affects only the personnel situation of the complaint, it will normally be treated as an allegation of a prohibited personnel practice or violation of other civil service law, rule or regulation, and the complainant will not be considered to be a whistleblower. 5 C.F.R. § 1250.3(c).

6. Appellant also argues that the district court had jurisdiction over the statutory claim because it was "pendent" to her constitutional claim. Appellant's Brief at 30. But, as Judge Oberdorfer noted in *Apodaca*, slip op. at 4: "the exercise of ancillary jurisdiction presupposes a right enforceable in itself—that is, a separate cause of action cognizable in some court." *See also Aldinger v. Howard*, 427 U.S. 1, 18, 96 S.Ct. 2413, 2422, 49 L.Ed.2d 276 (1976).

of speech under the First Amendment, in that her right as a probationary employee freely and constructively to comment upon and improve the functions of Defendant ICA and its Exhibits Service, a matter of legitimate public concern, was intentionally suppressed." A.A. A–29. The district court rejected the claim, stating without elaboration that "the Court finds that [Borrell's] dismissal was not tainted by unconstitutional improprieties." *Id.* at 49.

The district court apparently assumed—and we agree—that Borrell's allegation that she was dismissed because she voiced concerns over agency practices presented a claim of deprivation of a first amendment liberty without due process of law. *See Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Thus the question of whether the CSRA meant to wipe out such a preexisting cause of action comes immediately to the fore. This is an altogether different question from that discussed previously, *i.e.,* whether the CSRA *created* a new statutorily-based cause of action for whistleblowing retaliation. It is thus not governed by *Cort v. Ash* principles. Instead, the issue is whether Congress meant to take away from probationary employees preexisting rights of action to pursue constitutional rights in district court actions.

We think not. Where newly enacted statutory remedies are unavailable to a particular segment of employees, the Supreme Court appears to have imposed a kind of "clear statement" requirement on Congress, requiring it to indicate explicitly its intent to displace judicially-created remedies for constitutional deprivations. *See Carlson v. Green,* 446 U.S. 14, 18–19, 100 S.Ct. 1468, 1471–1472, 64 L.Ed.2d 15 (1980); *Davis v. Passman,* 442 U.S. 228, 246–47, 99 S.Ct. 2264, 2277–2278, 60 L.Ed.2d 846 (1979) ("We do not now interpret § 717 to foreclose the judicial remedies of those expressly unprotected by the statute. On the contrary, § 717 leaves undisturbed whatever remedies petitioner might otherwise possess.") We can find no such clear statement here. *See generally* Sager, *Foreword: Constitutional Limitation on Congress' Authority to Regulate the Jurisdiction of the Federal Courts,* 95 Harv.L.Rev. 17, 88 n.223 (1981). Nevertheless, the government argues that the district court's decision must be sustained because the CSRA preempts all alternative remedies for all employees, even those preexisting judicial remedies based upon the Constitution which have not been replaced by administrative appeals or judicial review of any kind.

The government's preemption argument is based upon *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). There the Supreme Court held Title VII of the Civil Rights Act of 1964 to be the exclusive source of judicial remedies for discrimination arising out of federal employment. After examining the statutory remedies, the court concluded:

> The balance, completeness, and structural integrity of § 717 are inconsistent with the petitioner's contention that the judicial remedy afforded at § 717(c) was designed merely to supplement other putative judicial relief. His view fails, in our estimation, to accord due weight to the fact that unlike these other supposed remedies, § 717 does not contemplate merely judicial relief. Rather, it provides for a careful blend of administrative and judicial enforcement powers. Under the petitioner's theory, by perverse operation of a type of Gresham's law, § 717, with its rigorous administrative exhaustion requirements and time limitations, would be driven out of currency were immediate access to the courts under other, less demanding statutes permissible. The crucial administrative role that each agency together with the Civil Service Commission was given by Congress in the eradication of employment discrimination would be eliminated "by the simple expedient of putting a different label on [the] pleadings." *Preiser v. Rodriguez,* 411 U.S. 475, 489–490 [93 S.Ct. 1827, 1836, 36

L.Ed.2d 439] (1973). It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading.

*Id.* at 832–33, 96 S.Ct. at 1967–1968 (footnote omitted). The government also argues that the District Court for the District of Columbia has, in two cases similar to the instant one, applied *Brown* to dismiss constitutional claims. *Brawner v. United States Department of the Navy,* No. 80–3195 (D.D.C. April 27, 1981); *Dearsman v. Kurtz,* 516 F.Supp. 1255 (D.D.C.1981). However, those cases, as well as *Brown,* are significantly different from this case. The Title VII statutory remedy involved in *Brown* was specifically found by the Court to have provided an enhanced and integrated administrative and judicial remedy to replace the former problematic judicial cause of action for discrimination. *Brawner* and *Dearsman* involved tenured employees who had access to the adverse action procedure of 5 U.S.C. § 7701, as well as to the OSC, 5 U.S.C. § 1206. We do not here presume to rule on the issue of whether the CSRA appeal procedures culminating in judicial review for tenured employees are the exclusive means of relief. We decide only that the limited statutory remedy provided probationary employees, who have no appeal to the MSPB or to a judicial forum at all from an adverse personnel action or from an OSC decision not to prosecute, is not an adequate enough substitute for a prior judicial cause of action so that we can infer from the statute a Congressional desire to eliminate the preexisting right. *Cf. Hodges v. Tomberlin,* 510 F.Supp. 1280 (S.D.Geo.1980) (Railway Labor Act, § 152, does not preempt § 1983 relief); *Brosnahan v. Eckerd,* 435 F.Supp. 26 (D.D.C.1977) (damage action against private individuals not foreclosed by Title VII); *Curran v. Portland Superintending School Committee,* 435 F.Supp. 1063 (S.D.Maine 1977) (Equal Employment statute does not preempt § 1983 action).

The government argues, however, that to permit a constitutional claim to be brought on behalf of a probationary employee will frustrate Congressional intent that judicial review of prohibited personnel practice claims should be resolved in the courts of appeals or Court of Claims and not the district courts. Our answer is that here we are concerned with appellant's *constitutional claim,* not her CSRA claim. The CSRA lays down a prescribed route for appeals from all prohibited personnel actions. *Whistleblower cases* involve only *one of eleven* prohibited personnel practices. We would, furthermore, be hard pressed to deny jurisdiction over a constitutional claim when the only alternative statutory remedy allows no right of individual participation by the injured employee and permits no judicial review of the merits of the agency official's decision not to investigate or prosecute the employee's claim.[7]

It seems clear to us that Congress intended the CSRA to provide *additional,* not decreased, protection for federal employees who blow the whistle on illegal or improper government conduct. *See* S.Rep.No. 969, 95th Cong., 2d Sess. 2 (1978) ("The bill . . . [p]rovides *new* protections for employees who disclose illegal or improper Government conduct . . . .") (emphasis added). *See also* 124 Cong.Rec. S14267 (daily ed. Aug. 24, 1978), *reprinted in* II House Committee on Post Office and Civil Service, 95th Cong. 1st Sess., Legislative History of the Civil Service Reform Act of 1978 at 1607 (1979) (hereinafter Legislative History); *id.* at 1725 (new protections created).

---

7. *But see Wren* at 875 n.9 (judicial review may be available to insure OSC compliance with 5 U.S.C. § 1206 duties).

The government itself acknowledges that "[s]hould a case arise where an employee was subjected by his or her agency to such a gross or flagrant violation of constitutional rights that CSRA does not provide adequate protection, then perhaps a district court could properly take jurisdiction to afford a remedy, but that is certainly not the case here." Appellee's Brief at 37 (footnote omitted). However, that standard raises troublesome questions. In order to find jurisdiction, the court must first make a judgment on how "gross" or "flagrant" the violation is, as well as how "adequate" the CSRA remedy. We can find no such amorphous jurisdictional standard in the Act.

Congress was patently aware that existing remedies were deficient, *see* 124 Cong.Rec. S14280 (daily ed. Aug. 24, 1978), *reprinted in* II Legislative History at 1633. It sought to encourage responsible whistleblowing, *id.*, by providing more immediate "meaningful protection," II Legislative History at 1632 and 1680, than existing "drawn out administrative and court proceedings." *Id.* at 825. But we can find no clear signal in that legislative history that Congress meant to deprive appellant of the only cause of action which she has to protect her constitutional rights and which she had even before the CSRA was passed.

The district court found—and the government argues alternatively on appeal—that Borrell failed to prove sufficiently that her discharge was caused by her first amendment activities rather than her poor work performance. The test for determining whether first amendment rights have been violated was set out by this court in *Mazaleski v. Truesdell*, 562 F.2d 701, 715 (D.C.Cir. 1977):

> The test ... requires not only that a plaintiff assume the initial burden of showing that his conduct was constitutionally protected and that it was a "substantial" or "motivating" factor in the government's adverse action, but also that, if plaintiff has carried his burden, the government may show by a preponderance of the evidence that it would have reached the same decision had the protected conduct never occurred.... The touchstone for decision, therefore, is the employee's job performance considered in its entirety.

*See also Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mt. Healthy School Dist. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In a case quite similar to the instant case, *Tygrett v. Barry*, 627 F.2d 1279 (D.C.Cir.1980), involving a discharged probationary employee of the District of Columbia active in lobbying for passage of a bill increasing employee pay, who alleged that his discharge violated the first amendment, the court observed: "When confronted with firings that impli-

cate a public employee's First Amendment rights, the courts are required to conduct an individualized and searching review of factors asserted by the employer to justify the discharge." 627 F.2d at 1282–83.

■ The record in this case offers much evidence to suggest that appellant's complaints about alleged unnecessary and wasteful travel by an agency official, the operation of a private real estate business from government offices by another, violation of nepotism rules by still another and extended purchase order contracts for vendors working on the premises of ICA, influenced her discharge. Conversely, there was also evidence that Borrell's performance fell short of a satisfactory level. Unfortunately, the district court made one laconic finding only: that appellant's discharge was "not tainted by unconstitutional improprieties." Surely that cannot be enough to satisfy the requirements of Rule 52(a) of the Federal Rules of Civil Procedure in this kind of case, where the core of the dispute is whether the employee was discharged for complaining about agency irregularities, admitted in part, or for poor job performance. Here the content of the complaint was later shown clearly to be reasonable. (The government concedes that Borrell disapproved of and complained to her co-workers about improprieties "generally known to have been occurring in the Exhibits Service" and that her complaining did not have a disruptive effect on the operations of the Service. Appellee's Brief at 39.) The government, in turn, argues that Borrell complained no more than her co-workers, and that her complaints were not addressed to anyone in the "chain of command." *Id.* We do not find these attempted diminutions of her whistleblower activities to be particularly persuasive or even relevant. *See* 5 C.F.R. § 1250.3(c) (OSC regulations state a protected disclosure may be "to any person within or outside the agency").

A court sitting without a jury is required by Rule 52(a) to "find the facts specifically and state separately its conclusions of law thereon ...." This mandate was not satisfied by the court's single statement of the

ultimate fact. *Cf. O'Neill v. United States*, 411 F.2d 139, 146 (3d Cir. 1969) (The requirement of Rule 52(a) is not satisfied "by the statement of ultimate fact without the subordinate factual foundations for it which must be the subject of specific findings."); *see also Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636 (D.C.Cir.1982); *H. Prang Trucking Co., Inc. v. Local Union No. 469*, 613 F.2d 1235, 1238–39 (3d Cir. 1980).

For this court to exercise adequately its power of review, the district court must make specific findings about the nature and truth of Borrell's allegations, the circumstances and timing of her complaints (including when she began to complain, to whom she complained, whether and when her complaining came to the attention of her superiors, and whether others in the agency were complaining about similar acts within the agency) and the history of Borrell's work performance (including the nature of the assignments, supervisor ratings, and timing of supervisory evaluations in relation to her complaints). All this is minimally necessary if the appellate court is to insure that federal employees' first amendment rights are not precipitously chilled.

### C. *Privacy Claim*

Appellant's claim under the Privacy Act, 5 U.S.C. § 552a(g)(1)(C), was dismissed by the district court because the court found that challenged statements in appellant's personnel file were neither disseminated to outside persons nor concerned matters outside the scope of employment.

The Privacy Act provision in question states:

Whenever any agency ... fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual ... the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provision of this subsection.

5 U.S.C. § 552a(g)(1)(C). Appellant requested the district court to enter a judgment finding that ICA officials "intentionally and willfully" violated the Privacy Act in that they maintained inaccurate files concerning her performance which resulted in her dismissal. She sought damages, costs and attorneys fees and a grant of "such other and further relief as may be just and equitable." A.A. A–33. Appellant now argues that the district court misconstrued her Privacy Act claim. Appellant says that she was not asserting an invasion of privacy claim; rather she was claiming that her personnel file contained inaccurate material on which subsequent adverse personnel actions were based. The government responds by stating:

No details were provided as to what in such document was deemed to be false, incomplete or inaccurate, nor is there any allegation as to kind or quantum of damages suffered as a result thereof, although "actual damages sustained" are prayed for. Appellant did not allege that she was not given access to said document upon request, that said document was ever disclosed to any person outside the Agency, or that the Agency failed or refused to correct any error in the document upon request.

Government's Brief at 43.

█ It is not entirely clear to us whether the district court's decision to dismiss Borrell's Privacy Act claim was based upon shortcomings in Borrell's pleading and proof or upon a misunderstanding of her cause of action. In short, the district court's findings on the Privacy Act—as well as the constitutional claims—fall short of the specificity requirements of Rule 52(a) of the Federal Rules of Civil Procedure. On remand, the district court should specify whether appellant satisfied her burden of pleading a *prima facie* claim under 5 U.S.C. § 552a(g), *see Mervin v. Federal Trade Commission*, 591 F.2d 821 (D.C.Cir.1978). If

she did, the court should make specific findings about the accuracy and fairness of the challenged statements in Borrell's personnel file, and determine whether any inaccurate statement contained therein resulted in appellant's discharge. If so, the court should order the appropriate remedy under 5 U.S.C. §§ 552a(g)(2)(A) and (B) and 552a(g)(4), which may include costs, fees, damages and amendment of Borrell's record.

## D. *FOIA Claim*

On appeal, Borrell urges that she "substantially prevailed" on her FOIA claim because a majority of the documents she sought access to were ultimately produced. She requests this court to enter a judgment that FOIA was violated and that she should be awarded attorneys' fees and other litigation costs pursuant to 5 U.S.C. § 552(a)(4)(E); she asks the court to make a further finding that the agency acted arbitrarily and capriciously in withholding certain documents. Appellant's Brief at 13, 43 & 47. We find that the district court was correct in its determination that FOIA was not violated, and affirm the court's dismissal of this claim.

## CONCLUSION

For the foregoing reasons, the dismissal of appellant's CSRA and FOIA claims is *affirmed,* and the remainder of the case is *remanded* for proceedings consistent with this opinion.

*So ordered.*