Barbara CUTTS, Appellant,

v.

Mark S. FOWLER, Chairman, Federal Communications Commission, et al.

No. 81–2049.

United States Court of Appeals, District of Columbia Circuit.

Argued April 26, 1982.

Decided Oct. 29, 1982.

As Amended Oct. 29, 1982.

Appeal from the United States District Court for the District of Columbia (D.C. Civil Action No. 80–01992).

Joseph B. Scott, Washington, D.C., with whom Irving Kator, Washington, D.C., was on the brief, for appellant. James H. Heller, Washington, D.C., also entered an appearance for appellant.

Rebecca L. Ross, Asst. U.S. Atty., Washington, D.C., with whom Stanley E. Harris, U.S. Atty., Royce C. Lamberth and Kenneth

M. Raisler, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before EDWARDS and BORK, Circuit Judges and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

The appellant, Barbara Cutts, raises three issues in this appeal. Two of those issues are disposed of by this court's opinion in *Borrell v. United States Int'l Communications Agency*, 682 F.2d 981 (D.C.Cir.1982), decided while appellant's case was pending. Appellant's third claim is that the anti-nepotism provision of the Civil Service Reform Act [1] ("CSRA") is unconstitutional as it was applied to her. Appellee, the Chairman of the Federal Communications Commission ("FCC"), *et al.*, contends that the district court does not have jurisdictional competence to consider that claim. We considered a similar jurisdictional claim in *Borrell* and our decision makes clear that the district court does have jurisdiction over appellant's constitutional claim.[2] Upon consideration of that claim, however, we find it to be meritless.

## I. BACKGROUND

Barbara Cutts has been a career civil servant at the FCC for more than 18 years, during which she indisputably "performed exceptionally well" and developed an expertise in "spectrum management." In 1966, appellant married Robert Cutts, another FCC employee. In 1975, Mr. Cutts was appointed head of Mrs. Cutts's division. She offered to resign, but agency officials dissuaded her and instead made an arrangement under which she would perform the same duties but report directly to the Chief Engineer. A reorganization in 1979–80 consolidated all spectrum management functions within a single division of the successor to the Office of Chief Engineer— the Office of Science and Technology (OST). Robert Cutts became head of the new division. To avoid potential nepotism problems, the FCC assigned Barbara Cutts to a different office at the same grade and pay, but without her former spectrum management responsibilities.

Mrs. Cutts contends the transfer violated the merit principles of the CSRA forbidding discrimination "on the basis of marital status," [3] and forbidding personnel actions "on the basis of conduct which does not adversely affect the performance of the employee...." [4] She presented her claims in a petition to the Special Counsel of the Merit Systems Protection Board (MSPB), who is charged with vindicating rights established under the Act. Special Counsel rejected her initial petition and a subsequent request for reconsideration, holding that the transfer was not a prohibited personnel action. Appellant then brought this action in district court, claiming (1) that she had a private right of action under the CSRA to prevent prohibited personnel actions, (2) that her transfer was not justified under the anti-nepotism statute, and (3) that, to the extent the anti-nepotism statute did permit the transfer, the statute is unconstitutional. The district court rejected all three arguments and granted summary judgment to appellee.[5] This appeal followed.

## II. DISCUSSION

### A. *The Private Right of Action*

In *Borrell*, we considered whether section 101(a) of the CSRA [6] provides for a private right of action to enforce restric-

---

1. 5 U.S.C. § 2302, Pub.L. No. 95–454 § 101, 92 Stat. 1113 (1978).

2. At 988–991 (D.C.Cir.1982).

3. 5 U.S.C. § 2302(b)(1)(E).

4. 5 U.S.C. § 2302(b)(10).

5. *Cutts v. Ferris*, No. 80–1992 (D.C.D.C. July 29, 1981).

6. 5 U.S.C. § 2302(b)(8)(A).

tions against reprisals for whistleblowing.[7] We explained that that issue was essentially one of legislative intent. *See Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). We found that in enacting the CSRA, Congress had not intended to create a private statutory right of action to enforce those restrictions. Although Congress enacted CSRA to safeguard all federal employees from prohibited personnel practices, the Act contains a detailed enforcement scheme to enforce its purpose. That scheme provides relief for certain actions, such as the transfer in this case, only through an employee petition to the Office of the Special Counsel ("OSC") for an investigation and corrective action. It is for the OSC to determine, in the first instance, whether a prohibited personnel practice has occurred and whether to seek correction from the MSPB and the courts. 5 U.S.C. § 1206, § 1208. *See Wren v. Merit Systems Protection Board,* 681 F.2d 867 (D.C. Cir.1982). Congress apparently wanted not only to provide an effective and expeditious process for dealing with such actions, but also to insure that abuse of that process would not interfere with legitimate personnel actions. *See Markup Session on S. 2460, Civil Service Reform Act* at 85–86 (unpublished, May 22, 1978) (remarks of Senators Percy and Chiles). Judicial review of an OSC decision is limited, at most, to insuring compliance with the statutory requirement that the OSC perform an adequate inquiry on which to base its disposition of an employee's petition.

### B. Appellant's Transfer Under CSRA

■ Having decided that the CSRA does not provide a private right of action in this situation, we need not reach appellant's claim that the transfer was inconsistent with the anti-nepotism provisions of the Civil Service Reform Act 5 U.S.C. §§ 2302(b)(7), 3110. Appellant's only recourse against her transfer was an appeal to internal management, a petition to the OSC, or an appeal to the political process

(Congress). She does not have standing to challenge the transfer under CSRA in this court.

### C. Appellant's Constitutional Claim

■ Appellant's third contention is that the anti-nepotism provision of CSRA is unconstitutional as applied to her. More specifically, appellant contends that her transfer placed an unconstitutional burden on her freedom to marry, which is protected by the Fifth Amendment. The government challenges the district court's assertion of jurisdiction over this claim. It contends the CSRA provides an exclusive remedy for prohibited personnel rights and that the plaintiff cannot create district court jurisdiction by recasting her claim as one arising under the Constitution.

*Borrell*[8] controls the jurisdictional dimension of this issue. There we noted that the creation of a new statutory remedy does not necessarily displace judicially-created remedies for constitutional deprivations. That issue turns on whether Congress meant for the new remedy to displace preexisting, judicially-created remedies, and whether the new remedies are adequate to protect the constitutional right at stake. A desire by Congress to displace judicially-created remedies will not be inferred lightly. The Supreme Court has imposed a "clear statement" requirement on Congress, requiring it to indicate explicitly its intent to displace judicially-created remedies for constitutional deprivations. *See Carlson v. Green,* 446 U.S. 14, 18–19, 100 S.Ct. 1468, 1471–1472, 64 L.Ed.2d 15 (1980); *Davis v. Passman,* 442 U.S. 228, 246–47, 99 S.Ct. 2264, 2277–2278, 60 L.Ed.2d 846 (1979). In this case, as in *Borrell,* we find no such clear statement. Thus, we find that the existence of CSRA procedures does not affect the jurisdiction of the district courts to hear constitutional claims based on personnel practices.

■ We find, however, that appellant's constitutional claim is without merit. In *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct.

---

**7.** At 985–988 (D.C.Cir.1982).

**8.** At 988–991 (D.C.Cir.1982).

1817, 1823, 18 L.Ed.2d 1010 (1967), the Supreme Court held that:

> The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness of free men.

The Court has emphasized, however, that "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." *Zablocki v. Redhail,* 434 U.S. 374, 386, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978); *see also Califano v. Jobst,* 434 U.S. 47, at 55 n. 12, 98 S.Ct. 95, 54 L.Ed.2d 228 (1978). Based on this proposition, courts have upheld anti-nepotism rules against constitutional challenges. *See, Keckeisen v. Independent School District 612,* 509 F.2d 1062 (8th Cir. 1975); *Southwestern Community Action Council v. Community Services Administration,* 462 F.Supp. 289 (D.W.Va. 1978). *See also Espinoza v. Thoma,* 580 F.2d 346 (8th Cir. 1978) (equal protection). The reasoning of those cases, followed by the district court here, is sound. Anti-nepotism rules play a legitimate and laudatory role in preventing conflicts of interest and favoritism in the working environment. At the same time, the burden on the "right to marry" is attenuated and indirect. The anti-nepotism policy of the FCC did not prohibit the Cutts's marriage; it only prevented the employment of Mrs. Cutts in a situation in which she would necessarily have been subject to the supervision of her husband. That aspect of this case distinguishes it from cases in which direct burdens on the right to marry have been struck down as unconstitutional. *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (Virginia miscegenation law); *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (Wisconsin law requiring residents paying child support to obtain court permission before marrying).

Appellant contends that in order to be constitutional, the statute should be read to prohibit only actual nepotistic acts, not the mere potential for favoritism. We disagree. In situations such as this one, where definite possibilities of conflict of interest exist, the FCC should not have the constitu-

tional burden of waiting until a conflict of interest becomes a problem before it can take action. The law should not block legitimate measures taken to anticipate such problems and avert them. *See Keckeisen v. Independent School District 612,* 509 F.2d 1062, 1066 (8th Cir. 1975). Besides, anti-nepotism policies not only address the problem of actual favoritism, they also alleviate the deleterious effect on morale that an apparently prejudiced arrangement can have on other employees. *Id.*

Finally, in the instant case, the anti-nepotism policy did not require the termination of Mrs. Cutts's employment; it only required that she be reassigned to a new division at her former grade and salary. Thus, it appears that the agency made a good faith effort to minimize the already attenuated burden the anti-nepotism policy placed on her right to marry.

The judgment of the district court is hereby

*Affirmed.*