Lawrence E. GRAY, et al., Appellants,

Augustus A. Simpson, Jr.

v.

OFFICE OF PERSONNEL MANAGE-
MENT, an Agency of the U.S.
Government, et al.

No. 84–5052.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 30, 1985.

Decided Aug. 9, 1985.

As Amended Aug. 27, 1985.

James H. Curtin, Washington, D.C., with whom Francis A. O'Brien, Washington, D.C., was on brief, for appellants. Stephen M. Ryan, Washington, D.C., entered an appearance for appellants.

Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence, William H. Briggs, Jr., Asst. U.S. Attys., and James S. Green, Atty., Office of Personnel Management, Washington, D.C., were on brief, for appellees.

Before ROBINSON, Chief Judge, STARR, Circuit Judge, and BRYANT*, Senior District Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

In this appeal, we are called upon to determine whether the District Court properly dismissed two consolidated actions brought by four Department of Labor Administrative Law Judges. The appellants were among a group of ALJs who remained at their GS–15 pay level despite an Office of Personnel Management directive promoting thirty-nine of their colleagues to GS–16. Eighteen months after petitioning OPM to direct their promotion and not having received a definitive response, appellants filed suit in federal district court challenging OPM's failure to promote them as violative of, *inter alia*, the Classification Act, 5 U.S.C. §§ 5101 *et seq.* (1982), the Back Pay Act, *id.* §§ 5596 *et seq.* (1982) and their Fifth Amendment right to due process. The District Court dismissed appellants' statutory claims for lack of subject

matter jurisdiction, citing this Court's decision in *Carducci v. Regan*, 714 F.2d 171 (D.C.Cir.1983), and rejected on the merits appellants' constitutional claims.

### I

The relevant facts are not in dispute. The appellants, Melvin Warshaw, Lawrence Gray, Edward Murty, Jr. and Peter Giesey, are presently GS–16 Administrative Law Judges employed by the Department of Labor. However, in August 1981, when OPM directed the promotion of thirty-nine GS–15 ALJs at the Department of Labor to GS–16, appellants were not among those promoted.

### A

The August 1981 promotions represented the culmination of an effort by OPM to restructure the Department of Labor's ALJ corps. Prior to April 1981, ALJs at the Department fell into one of three position descriptions: performance of (1) exclusively GS–16 level casework, or (2) exclusively GS–15 level casework, or (3) a combination of the two types of casework. The third category of ALJs, referred to by the parties as "dual position" ALJs, were compensated at the GS–15 level.

Pursuant to its authority to review agency implementation of classification standards under the Classification Act, OPM reviewed the classification of ALJ job descriptions at the Department. As a result, in April 1981 OPM reclassified from GS–15 to GS–16 two of the types of cases presided over by "dual position" ALJs, namely cases under the Longshoremen's and Harbor Workmen's Compensation Act ("Longshoremen's") and cases under the Comprehensive Employment and Training Act ("CETA"). This reclassification tipped the balance of GS–15 and GS–16 level cases handled by "dual position" ALJs in favor of a GS–16 classification for such judges. OPM, accordingly, examined the overall

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 294(d).

workload performed by the Department's ALJ corps and determined that, as a result of the reclassification of CETA and Long-shoremen's cases, thirty-six new GS–16 ALJ positions should be created. Consulting the GS–16 "Register,"[1] OPM determined that thirty-nine of the fifty-one "dual position" ALJs were qualified to fill the new positions and, in consequence, directed their promotions pursuant to 5 C.F.R. § 930.204(b) (1985).[2] Appellants were not listed on the Register, however, and were therefore not among the thirty-nine ALJs promoted in August 1981.

### B

Appellants filed an appeal with OPM late in 1981. They asserted that notwithstanding the reclassification of job descriptions and the promotion of thirty-nine "dual position" ALJs, the actual work assignment practices at the Department had remained as before. The unhappy result of the confluence of promotions and unaltered work assignments was that both the thirty-nine recently-promoted ALJs and those left to languish at the GS–15 level were still functioning as "dual position" ALJs. Consequently, appellants argued, the merit system principle of equal pay for equal work was being violated in contravention of both the Classification Act and the Civil Service Reform Act of 1978 ("CSRA"), Pub.L. No. 95–454, 92 Stat. 111 (codified as amended in scattered sections of 5 U.S.C. (1982)). In

addition, appellants argued that pursuant to 5 C.F.R. § 930.204(b) (1985), *supra* note 2, all "dual position" ALJs should have been promoted to GS–16 as soon as the Longshoremen's and CETA cases were reclassified, inasmuch as these ALJs were, at that time, performing principally GS–16 work.

OPM investigated appellants' complaint and concluded that the Department of Labor had, in fact, failed properly to implement OPM's reclassification plan. As OPM had envisioned the plan's operation, a bright line was to be drawn between GS–16 and GS–15 ALJs; that is, in OPM's contemplation, only GS–16 ALJs (who comprise 70% of the total ALJ corps at the Department of Labor) would perform GS–16 work and those ALJs would perform only GS–16 work. In contravention of this clear demarcation of GS level and level of responsibility, the Department was assigning GS–16 work to both GS–16 and GS–15 ALJs, all of whom would then devote approximately 70% of their time to performing GS–16 work.

### C

In response to DOL's apparent management disarray, OPM froze GS–16 promotions for otherwise qualified GS–15 ALJs; moreover, OPM refused to act on individual appeals until the unhappy situation of blended responsibility could be re-

---

1. An ALJ listed on the GS–16 Register has already been determined to be qualified for promotion to the GS–16 pay level as soon as a position becomes available.

2. In June 1981, 5 C.F.R. § 930.204 was amended. The existing regulation was renumbered § 930.204(a) and a new § 930.204(b) was added. The text of the new regulation, published in the Federal Register on June 16, 1981 and subsequently in the Code of Federal Regulations on July 16, 1981, reads as follows:

   (a) When the Office of Personnel Management classifies an occupied administrative law judge position at a higher grade, the Office of Personnel Management shall direct the promotion of the incumbent administrative law judge and the promotion is effective on the date named by the Office of Personnel Management. This regulation pertains only to appointments to positions which because of

their substantive and technical nature warrant a grade GS–16; the regulation does not pertain to positions which because of their managerial and administrative nature warrant a grade GS–16.

   (b) No more than twice during a calendar year, an agency may notify the Office of Personnel Management that it wishes to fill a specific number of its grade GS–16 ALJ vacancies from among its grade GS–15 ALJs who are on the GS–16 ALJ register and who have served as judges at the agency for at least one year. The Office of Personnel Management shall select from the grade GS–15 ALJs of that agency those ALJs who it determines are best qualified for appointment to a grade GS–16 ALJ position and shall direct their appointment by the agency to such grade GS–16 ALJ positions.

solved. Meanwhile, however, appellants repeatedly filed with OPM individual requests for promotion to GS–16. Frustrated in their attempt to speed up resolution of their respective appeals, appellants took leave of the administrative battlefield and repaired to federal district court.

In March 1983, shortly after the District Court actions were instituted, OPM's Director informed appellants that his agency could not authorize, at that time, additional GS–16 promotions because the 1981 reclassification and promotion scheme remained improperly implemented; it was therefore not possible at that stage, the OPM Director maintained, to determine whether additional GS–16 positions would be available once the plan finally began to operate as intended. The Director further represented that once the management task at hand was completed, appellants' appeals would again be reviewed.

### D

Despite these assurances, appellants continued to pursue their cases in district court. In his complaint, appellant Warshaw sought to compel OPM to direct his promotion outright. Jurisdiction was founded on the Mandamus Act, 28 U.S.C. § 1361 (1982). The gravamen of Mr. Warshaw's complaint was that, inasmuch as he had "fulfilled the promotional requirements contained in 5 C.F.R. § 930.204(b)," he should be considered "among the eligible GS–15 ALJs that DOL ... had previously requested OPM to select for appointment to vacant GS–16 ALJ positions." J.A. at 14 (Complaint filed in *Warshaw,* C.A. No. 83–0248).

In *Gray,* three appellants filed a separate complaint seeking damages and injunctive relief in addition to mandamus. Juris-

diction was based, *inter alia,* on the Administrative Procedure Act, 5 U.S.C. §§ 706 *et seq.* (1982), the Back Pay Act, 5 U.S.C. § 5596, the Mandamus Act, *supra,* and the Fifth Amendment. The gravamen of the *Gray* appellants' complaint was that, had OPM applied 5 C.F.R. § 930.204(a) (1982), instead of the newly promulgated § 930.-204(b), OPM would have been required to promote all fifty-one "dual position" ALJs. *See supra* note 2. As a result, appellants asserted, they were being denied equal pay for equal work in contravention of both the Classification Act and the CSRA. In their prayer for relief, appellants sought, among other things, an order compelling OPM to direct their promotion, back pay, punitive damages and attorneys' fees (based on a claim of OPM's bad faith in refusing to respond to their request for promotion). J.A. at 32–34 (Complaint filed in *Gray,* C.A. No. 83–0354).

### 1

The *Warshaw* and *Gray* cases were consolidated and a single order, entered on December 21, 1983, dismissed the cases for lack of subject matter jurisdiction, based upon this court's supervening decision in *Carducci v. Regan,* 714 F.2d 171 (D.C.Cir. 1983).[3] With respect to appellants' nonconstitutional claims, the District Court held that, in light of this court's holding in *Carducci* (*i.e.,* that " 'the exhaustive remedial scheme of the CSRA would be impermissibly frustrated by permitting far lesser personnel actions not involving constitutional claims[ ] an access to the courts more immediate and direct than the statute provides with regard to major adverse actions,' " J.A. at 4–5 (quoting *Carducci, supra,* 714 F.2d at 174)), appellants were required to process their claims through the

---

**3.** In *Carducci,* a United States Customs Service employee, who had been involuntarily reassigned on the basis of poor performance, appealed from a district court order dismissing his request for judicial review. This court affirmed the district court's holding that the employee had failed to state a claim upon which relief could be granted under the APA. The principal rationale was that, under the CSRA, none of Mr. Carducci's claims satisfied the definition of an

"adverse action"; with respect to the remainder of his claims, either the "prohibited personnel practice" complaints had not been properly exhausted before the Office of Special Counsel or, in some cases, the personnel action taken against him was one "committed to agency discretion by law" and was therefore unreviewable. 714 F.2d at 174 (quoting 5 U.S.C. § 701(a)(2) (1976)).

Office of Special Counsel ("OSC") and, if appropriate, the Merit Systems Protection Board ("MSPB"), before repairing to federal court.[4] Specifically, the District Court concluded that appellants' claims did not rise to the level of "adverse actions" within the meaning of 5 U.S.C. § 7521 (1982);[5] however, the District Judge observed that their allegations could constitute grounds for a claim of "prohibited personnel practices" under *id.* § 2302(a)(2)(A)(x) ("significant change in duties or responsibilities which is inconsistent with the employee's salary or grade level"). The theory supporting this determination, in the District Court's view, was that the classification "laws and regulations [which were] allegedly violated implement the merit system principles which protect against arbitrary action, and insure fair and equitable treatment including equal pay for equal work." J.A. at 241–42 (citing 5 U.S.C. § 2301(b) (1982)).

Accordingly, the District Court concluded that, under *Carducci*'s teaching, appellants were required to exhaust the Office of Special Counsel-MSPB avenue of appeal. The District Court observed in this respect that, because appellants could now repair to the OSC, retroactively applying *Carducci* to their respective situations would not leave appellants without an adequate remedy. In addition, no basis could be found, the District Court stated, for distinguishing appellants from their counterpart in *Carducci.*

### 2

Moving to another branch of appellants' attack, the District Court held that the Back Pay Act did not confer federal court

jurisdiction under these circumstances, inasmuch as appellants "are entitled to back pay only if they succeed on the merits of their claims." J.A. at 10 n. 6. Success on the merits could be had, of course, only after recourse to the Congressionally provided avenue of potential relief. With respect to the contention that OPM's delay and general mishandling of appellants' claims violated their Fifth Amendment right to due process, the District Court concluded that, even assuming the existence of a cognizable "property" interest, appellants might have more promptly obtained OPM's decision regarding their appeals had they utilized the proper procedures and repaired to the OSC. Finally, the District Court dismissed a *Bivens* claim[6] on the authority of the Supreme Court's decision in *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). Under that holding, Congress' crafting of such a comprehensive remedial scheme in the sensitive area of federal civil service personnel relations precluded the judicial creation of a cause of action directly under the Constitution. The District Court concluded that *Bush v. Lucas* fully applied here in light of the fact that the CSRA provides a comprehensive scheme of review "which prohibits arbitrary action and provides procedures by which improper action may be redressed." Order at 11, J.A. at 246.

### II

On appeal, appellants argue that the District Court erred on several grounds in dismissing their claims for lack of subject

---

**4.** We observe at this juncture that appeals from decisions of the MSPB must be filed in the United States Court of Appeals for the Federal Circuit pursuant to the Federal Courts Improvement Act, 5 U.S.C. § 7703(b)(1) (1982). In addition, the question where any mandamus action would lie is implicated by this Court's decision in *Telecommunications Research & Action Center v. FCC,* 750 F.2d 70 (D.C.Cir.1984).

**5.** The term "adverse actions" as used in the CSRA context is defined as

"(1) a removal;

(2) a suspension;

(3) a reduction in grade;

(4) a reduction in pay; and

(5) a furlough of 30 days or less."

*See* 5 U.S.C. § 7521 (1982). Personnel actions which rise to level of "adverse actions" are directly appealable to the MSPB. *See id.* §§ 7501–7701 (1982).

**6.** *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (holding, of course, that a cause of action can be implied from the Constitution itself).

matter jurisdiction. First, appellants contend that *Carducci* does not apply at all to suits brought by ALJs pursuant to the Administrative Procedure Act; in their view, the institutional need of ALJs for decisional independence mandates a greater degree of protection than that afforded by the CSRA. ALJs are, appellants contend, sufficiently distinct from all other civil service employees that the CSRA's elaborate provisions, as elucidated by *Carducci*, should not preclude a direct federal court action under the APA. As a fallback position, appellants urge this court to reconsider *Carducci*, arguing that the decision is inconsistent with prior decisions of this court as well as a recent First Circuit decision. If *Carducci* must live, appellants argue next, it should nevertheless not be applied retroactively to bar their claims, which arose pre-*Carducci* and were brought into federal district court before that decision was handed down. Furthermore, in appellants' view, statutory grounds exist independent of the CSRA for retaining jurisdiction and that, in consequence, the District Court improperly dismissed their claims. Finally, appellants attack the District Court's determination that their due process claim lacked merit.

## A

Two grounds, in appellants' view, support their contention that ALJs should be treated differently from other civil service employees for purposes of obtaining judicial review. First, appellants maintain that under this court's decisions in *Friedman v. Devine*, 711 F.2d 420 (D.C.Cir.1983) and *Etelson v. OPM*, 684 F.2d 918 (D.C.Cir. 1982), as well as the First Circuit's decision in *Dugan v. Ramsay*, 727 F.2d 192 (1st Cir.1984), review under the Administrative Procedure Act remains available to ALJs despite the passage of the CSRA. In addition, appellants rely upon the myriad of statutory provisions, some of which are found in the CSRA, which single out ALJs

for special treatment in one form or another.

1

In *Friedman*, an applicant for an ALJ position challenged OPM's failure to credit toward his seven-year, litigation-experience requirement time spent in an agency's "Advice Division." Granting OPM's motion for summary judgment, the District Court based its jurisdiction on the APA with no discussion whatever of the CSRA. 565 F.Supp. 200 (D.D.C.1982) *aff'd mem.*, 711 F.2d 420 (D.C.Cir.1982).[7] Likewise in *Etelson, supra*, plaintiff challenged OPM's method of evaluating candidates for ALJ positions. In our opinion in *Etelson*, this court held that OPM's method of evaluating the litigation experience of government attorneys on the basis of grade level, while evaluating private attorneys on the basis of actual litigation experience, was arbitrary and capricious within the meaning of the APA. The court, like the District Court in *Friedman*, did not discuss the CSRA; that omission, however, is hardly surprising inasmuch as the claim in Etelson's case arose in 1970, nearly nine years before the CSRA's effective date. Review under the CSRA would therefore not have been appropriate in *Etelson*, inasmuch as the plaintiff's claim was pending prior to that statute's effective date. *See* 5 U.S.C. § 7703(b)(1) (1982); *see also* 5 C.F.R. § 1201.191(b) (1985); *Kyle v. ICC*, 609 F.2d 540 (D.C.Cir.1980) (interpreting both the statute and the regulation).

In contrast to the silence of the District Court in *Friedman* and this court in *Etelson*, an authoritative interpretation of the CSRA's impact on preexisting avenues of judicial review was subsequently rendered in *Carducci v. Regan, supra*, 714 F.2d 171. In *Carducci*, this court examined in detail the remedies available to civil service employees under the CSRA. Examining this court's decisions in *Borrell v. United States Int'l Communications Agency*, 682 F.2d 981 (D.C.Cir.1982), and *Cutts v. Fowler*, 692 F.2d 138 (D.C.Cir.1982), the court

---

7. This court's affirmance of that decision was not embodied in a published opinion, thus rendering our decision in the *Friedman* appeal without precedential significance.

first separated constitutional claims from nonconstitutional ones. With respect to the latter category, the court held that under the regime ushered in by the CSRA, such complaints were reviewable (1) directly by the MSPB ("adverse actions"); or (2) reviewable first by the Office of Special Counsel ("prohibited personnel practices"), which could take several kinds of action including prosecuting the case before the MSPB; or (3) in rare instances, not at all (committed to agency discretion). With respect to the constitutional claims advanced in that case, the court found them inadequately briefed and therefore declined to resolve them. 714 F.2d at 177.

### 2

Appellants' argument based on *Friedman* and *Etelson* fails for the simple reason that neither case provides true circuit precedent on the question of the CSRA's impact on the availability of judicial review. Indeed, there was no opinion at all by this court in *Friedman, see supra* note 7; *Etelson* did not, as we discussed previously, purport to examine the CSRA inasmuch as the claim was pending prior to the effective date of that Act. Finally, both cases predate *Carducci*, which comprehensively addressed the CSRA's scheme for judicial review of non-constitutional claims arising out of agency actions taken against federal employees.

Inasmuch as *Carducci* represents controlling precedent in this circuit, appellants make several attempts to challenge or avoid its holding. First, appellants argue that *Carducci* is wrong and should be reconsidered. As evidence of the "error" in *Carducci*, appellants rely upon not only its alleged break with the *Friedman* and *Etelson* "precedents," but its inconsistency with the First Circuit's post-*Carducci* decision in *Dugan v. Ramsay, supra,* 727 F.2d 192. In *Dugan,* the First Circuit held that despite passage of the CSRA, APA review remained available to an applicant for an ALJ position, a conclusion clearly contrary to *Carducci.* Appellants would have us follow *Dugan.* This, of course, we cannot

do. *Carducci* is binding precedent which can be overruled only by the court *en banc.*

Appellants next attempt to cabin *Carducci*'s scope. In this respect, appellants contend that *Carducci* can be distinguished from *Friedman, Etelson* and *Dugan* on the obvious ground that the civil service employee in *Carducci* was not an ALJ. Renewing their argument that ALJs are distinct, appellants emphasize that ALJs' need for decisional independence dictates a higher degree of protection from coercion. Appellants assert that unless judicial review is available a "wrong thinking" ALJ could be punished and left with no effective means to counteract the coercive effect of personnel policies implemented for this illicit purpose. Appellants' Brief at 23. Appellants seek to buttress their argument by pointing out that *Friedman, Etelson* and *Dugan* all involved ALJ positions while *Carducci* did not; the difference in outcome in these cases, they contend, can be explained by the fact that ALJs are generally treated differently from civil servants who do not carry on adjudicatory functions. Moreover, appellants cite numerous statutory provisions in which ALJs are singled out for special treatment.

### 3

While recognizing the pivotal importance of the work of the ALJ corps, we are nonetheless unpersuaded by appellants' attempt to confer special status on ALJs beyond that expressly provided by Congress. It is, to be sure, true that Congress has often recognized the special status of ALJs. Appellants understandably go into some detail identifying numerous provisions in which Congress has singled out ALJs for special treatment. *See* Appellants' Brief at 23–27. However, as the District Court rightly observed, Congress, in outlining the elaborate procedures for review of adverse agency actions in the CSRA, expressly imposed a requirement on the MSPB that it make a determination of good cause (after an opportunity for hearing) before the challenged "adverse action" is taken by an agency against an ALJ. *See* Order at 9, J.A. at 244; 5 U.S.C. § 7521

(1982). Tellingly, however, no special provision for ALJs was set forth by Congress with respect to review of "prohibited personnel practices."[8] Clearly, had Congress intended to treat ALJs differently as to "prohibited personnel practices," it could have done so explicitly just as it did with respect to "adverse actions." We can not and will not, to achieve what is plainly a laudable policy goal sought by appellants, add a statutory provision which the First Branch did not include.

### B

■ Finding appellants' effort to limit *Carducci*'s reach unavailing, we turn to consider their argument that even if *Carducci* could be applied to ALJs as a group, it should not apply here because appellants' claims were pending before the District Court prior to the date *Carducci* was handed down. Appellants concede that retroactive application of judicial decisions is the general rule but argue that retrospective applicability is not warranted in this case.

In *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court identified three factors as relevant to the question of nonretroactivity *vel non:*

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will fur-

ther or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

404 U.S. at 106–07, 92 S.Ct. at 355 (citations omitted). Nothing in *Huson* mandates that all three factors be satisfied in order to decide the issue in favor of nonretroactivity; on the contrary, it appears that the Court contemplated the carrying out of a balancing process to make this determination.

Arguing from *Huson*'s teaching, appellants contend that retroactive application is not mandated because (1) *Carducci* broke with precedent and established a new principle of law; (2) no purpose would be served by requiring appellants to pursue alternative remedies; and (3) a substantial inequitable result would be occasioned if OPM were allowed to profit from its own delay at great expense to appellants. Specifically, appellants claim that *Carducci* established a new principle of law when, for the first time, it precluded judicial review under the APA of agency actions taken against ALJs.

Upon analysis, however, we can find no "clear past precedent" having been overruled by *Carducci;* moreover, while the precise issue presented in *Carducci* was one of the first impression, its eventual resolution had been foreshadowed by the enactment of the CSRA itself and even more clearly by two post-CSRA decisions of this court.[9] Thus, *Carducci* does not represent the sort of dramatic reversal of past practice which was presented to the Court in *Huson,* where a party suddenly found

---

**8.** Appellees argue, and appellants do not contest, that a challenge to OPM's refusal to promote on the basis that it is in disregard of law (in that it is arbitrary and capricious) is a challenge to a "prohibited personnel practice." As the District Court found, "the proscription against specified personnel practices, 5 U.S.C. § 2302(a)(2)(B), include[s] those concerning promotions" and insofar as appellants "invoke the general precept of equal pay for equal work," they are claiming that OPM has commit-

ted a "prohibited personnel practice." *See* Order at 8, J.A. at 243.

**9.** *See Borrell v. United States Int'l Communications Agency,* 682 F.2d 981 (D.C.Cir.1982), and *Cutts v. Fowler,* 692 F.2d 138 (D.C.Cir.1982) (both cases holding that the CSRA did not affect preexisting rights to judicial review of *constitutional,* as opposed to nonconstitutional, claims).

himself subject to a shorter statute of limitations.[10]

The second *Huson* factor, whether retroactive operation would further or retard the newly adopted principle, does not favor appellants. The rationale articulated in *Carducci* is, as we have seen, that "the scheme of the CSRA would be impermissibly frustrated by permitting, for lesser personnel actions not involving constitutional claims, an access to the courts more immediate and direct than the statute provides with regard to major adverse actions." 714 F.2d at 174; *see supra* page 1507. That principle would be retarded, not furthered, were appellants' claim permitted to proceed in court notwithstanding the ready availability of the elaborate administrative apparatus fashioned by Congress in the CSRA.

Least of all can appellants satisfy *Huson*'s third factor, namely that substantial inequity will result if *Carducci* is retroactively applied.[11] Unlike cases such as *Huson*, involving statutes of limitations, see Appellants' Brief at 38, appellants' cause of action will not be lost by our faithfully following *Carducci*'s teaching. Appellants are being required to comport themselves with Congressionally provided procedures for obtaining relief by presenting a cognizable claim to the Office of Special Counsel; they are by no means being left remediless.[12]

10. In *Huson,* the plaintiff had lost his cause of action when the District Court applied a recently decided case, *Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), which made a State's statute of limitations, rather than the federal common law of laches, applicable under the Outer Continental Shelf Lands Act. The Supreme Court reversed the retroactivity ruling, refusing to apply *Rodrigue* to bar the action. In addition to presenting less compelling circumstances than those presented in *Huson,* appellants' argument that the first *Huson* factor suggests *Carducci* should not be applied retroactively loses its force in view of the fact that the employee in *Carducci* itself, who was of course faced for the first time with what appellants argue was an unforeshadowed reversal of past precedent, was not entitled to a decision on the merits of his "prohibited personnel practice" claims until he first took those claims to the Office of Special Counsel. Indeed, with respect to those of Mr. Carducci's claims that the court found to be "committed to agency discretion by law," Mr. Carducci lost his cause of action altogether.

11. Appellants assert in this respect that to apply *Carducci* retroactively would be inequitable because it would allow OPM to profit from its own delay. Had OPM not waited more than 18 months to notify appellants of the status of their appeal, appellants argue with obvious force, *Carducci* would not yet have been decided. There are, however, two problems with this argument: first, as the District Court observed, "had plaintiffs [initially] pursued their statutory remedy and filed a complaint with the Office of Special Counsel they might have learned of the denial of their appeals more promptly," Order at 10–11, J.A. at 245–46, or, we observe, obtained relief; second, it is scarcely clear that, had *Carducci* not been decided, appellants in this case would not have found themselves in the shoes of the appellant in *Carducci* whose "prohibited personnel practice" grievances were dismissed, as we have seen, for failure to exhaust through the Office of Special Counsel.

12. Appellants contend that being forced to exhaust OSC procedures is patently unpromising, citing a letter sent by appellants' counsel to the Office of Special Counsel. The District Court did not have occasion to address the significance of this latter-day communication for the obvious reason that the letter was not sent to the OSC until February 1984, more than one month *after* the District Court issued its order dismissing appellants' claims. Appellants argue that the OSC's response, denying the petition and closing its file in the matter, illustrates "the inadequacy of the Office of Special Counsel and the hollowness of the district court's assurance that retroactive application of *Carducci* would not leave appellants without an effective avenue of relief." Appellants' Reply Brief at 16.

In our view, appellants' argument with respect to counsel's letter to the OSC is unavailing for two reasons. First, appellants fail correctly to characterize the Special Counsel's response; the OSC informed appellants that they had failed to allege a "prohibited personnel practice" in their complaint and that "matters involving position classification are not within the investigative authority of the Special Counsel absent some evidence of a prohibited personnel practice." Appellants' Reply Brief, Exhibit F. Indeed, a review of the letter reveals that while appellants' counsel contended that a "prohibited personnel practice" had occurred, their argument was undermined by their emphasis that under the classification scheme in operation at the Department of Labor as of January 1984, the "most complex, responsible and rewarding case assignments" had been taken away from them. Appellants' Brief, Exhibit E at 2. In

## C

In addition to their APA claims, appellants advance a constitutional claim in support of their challenge. Specifically, appellants contend that the glacial manner in which OPM processed their claims worked a violation of appellants' due process rights in contravention of the Fifth Amendment. The court in *Carducci* was likewise faced with a constitutionally-based claim but declined to address the contention based upon the barebones assertion of a constitutional right with virtually no elaboration or development of the contention so as to permit careful judicial evaluation of the claim.

■ Here too, the District Court was faced with a barebones assertion of a Fifth Amendment claim with little elaboration. In fairness to appellants, however, they finally articulated their Fifth Amendment claim more clearly on appeal, arguing in their Reply Brief that OPM's intransigence and delay in processing their complaint violated appellants' due process rights. This is, of course, terribly late in the litigation day, sufficiently so as to warrant our declining, for the reasons aptly stated by *Carducci*, to address their claims. But in any event we find this eleventh-hour elucidation of an asserted constitutional claim to be of no avail; the constitutional challenge is moot to the extent appellants' claim was grounded upon a request for injunctive relief from OPM's delay in rendering a decision. That delay has, of course, ended.[13]

other words, the merit system principle of equal pay for work of equal value was, the letter suggested, no longer implicated inasmuch as appellants were no longer performing GS–16 work. In a word, OSC's response to a single, somewhat imprecise letter simply does not rise to the level of an outcome-determinative event. Secondly, as we hold today in our decision in *Barnhart v. OPM*, 771 F.2d 1515 (D.C.Cir.1985), the OSC provides an adequate remedy for civil service employees who seek to challenge an agency action on the ground that it constitutes a prohibited personnel practice. The statutes and regulations governing the Office of Special Counsel and the MSPB strongly support the adequacy of this avenue of appeal when that avenue is properly utilized. Moreover, the OSC did not have the benefit of our decision in *Barnhart* when it received the letter from appellant's counsel, and thus there may have been some uncertainty as to the scope of the OSC's authority or, more precisely, as to what could constitute a "prohibited personnel practice."

13. Appellants contend that their constitutional claim is not entirely moot because they requested monetary relief in the form of litigation expenses and back pay. However, appellants have not yet proven entitlement either to litigation expenses or back pay and cannot do so until they prevail on the merits of their classification appeal. To address appellants' constitutional claim (that the agencies involved should be held liable for monetary damages resulting from a violation of appellants' constitutional rights) would, it seems to us, permit appellants to achieve through the back door what they cannot do directly. Moreover, as the District Court observed, any injury appellants may have sustained during the period in which they claim OPM unjustifiably delayed in acting on their appeals was occasioned, at least in part, by appellants' failure to pursue their statutory rem-

edy by repairing to the Office of Special Counsel; had appellants followed proper procedures, they may well have learned of the denial of their appeals much earlier, if not have obtained relief. The Office of Special Counsel is available, moreover, to prosecute facially meritorious "prohibited personnel practice" complaints at no expense to employees. More fundamentally, appellants' constitutional claims, even if properly presented, perhaps could not succeed on the merits. *See, e.g., Duarte v. United States,* 532 F.2d 850, 852 (2d Cir.1976); *Canadian Transport Co. v. United States,* 430 F.Supp. 1168, 1172–73 (D.D.C.1977); *cf. Jayvee Brand, Inc. v. United States,* 721 F.2d 385, 388 (D.C.Cir.1983) (holding that suits against the United States are generally precluded under the doctrine of sovereign immunity unless expressly and specifically waived). Arguably, appellants can recover money damages for a violation of their Fifth Amendment rights only through an action against an official acting in his individual capacity. *See Bivens, supra,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Although appellants included a *Bivens* claim in their District Court action, they have not appealed from the dismissal of that claim. *See supra* pages 1507–08. We need not resolve this issue, however, inasmuch as appellants' claim for damages is premature, whatever its merit; we are nonetheless troubled by much the same concerns that prompted the Supreme Court in *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), to observe that

if the respondents were correct in their claims to retroactive classification and money damages, many of the federal statutes—such as the Back Pay Act—that expressly provide money damages as a remedy against the United States in carefully limited circumstances would be rendered superfluous.

### D

As a final attempt to preserve federal court jurisdiction, appellants assert that the District Court had jurisdiction (1) under the Mandamus Act, 28 U.S.C. § 1361 (1982), due to the presence of a claim that OPM was refusing to perform its statutory duty to render a decision; and (2) under amendments to the Back Pay Act, 5 U.S.C. § 5596(b)(3) (1982), due to the presence of a claim for entitlement to back pay for the period appellants allege they were wrongfully paid at the GS–15 level.

■ Although the District Court did not separately address the back-pay and mandamus claims, we conclude that neither claim provides a basis for jurisdiction. The mandamus claim is clearly moot. It is manifestly unnecessary to compel OPM to act on appellants' claim, inasmuch as OPM rendered its decision nearly two years ago. As if more were needed, for mandamus to lie appellants must not have an adequate alternative remedy; yet, as we have discussed at length, appeal to the OSC has been and remains open to appellants, and they have failed to demonstrate the inadequacy of this avenue of appeal. *See supra* note 12; *Barnhart v. OPM*, 771 F.2d 1515 (D.C.Cir.1985).

■ The back-pay claim likewise must fail because the Back Pay Act provides that an employee cannot obtain back pay unless the employee is first "found by appropriate authority ... to have been affected by an unjustified or unwarranted personnel action." 5 U.S.C. § 5596(b)(1) (1982). That is an issue yet to be determined, as we have seen; thus, any Back Pay Act claim is, at this juncture, premature.

In addition, it is not entirely clear that appellants could succeed on the merits of their back-pay claim. The Back Pay Act requires a *withdrawal* or *reduction* in pay for a cause of action to lie. *See United States v. Testan*, 424 U.S. 392, 405–07, 96 S.Ct. 948, 956–57, 47 L.Ed.2d 114 (1976). It is not immediately apparent that any reduction or withdrawal, in the traditional sense, has occurred here; appellants seek compensation from OPM and the Department of Labor for allegedly wrongfully failing to promote appellants, rather than for actually lowering appellants' GS-level and thereby decreasing their salary and benefits. Appellants argue that a 1978 amendment to the Back Pay Act (adopted as part of the CSRA) modifying the definition of "personnel action" so as to include within that term an "omission or failure to take an action or confer a benefit," 5 U.S.C. § 5596(b)(3) (1982), provides "a remedy for persons in appellants' position." Appellants Reply Brief at 12. We observe that at least one court has decided the issue contrary to the resolution appellants urge upon us. *See Spagnola v. Stockman*, No. 82–3584, slip op. (D.D.C. May 19, 1983). We need not, however, resolve this issue in order to dispose of appellants' back-pay claim, and we therefore express no opinion as to either the impact of the 1978 amendments to the Back Pay Act or the applicability of *Spagnola* to the facts of this case. It is sufficient for our purposes that appellants have not yet been found by an appropriate authority to have been wrongfully denied promotion.[14]

---

*Id.* at 404, 96 S.Ct. at 956. Appellants implicitly acknowledge as much by including in this action a claim for back pay under the Back Pay Act.

14. Appellants rely in part on *Crowley v. Shultz,* 704 F.2d 1269 (D.C.Cir.1983). While in *Crowley* this court noted that "[i]t is accepted practice for District Courts to grant relief under the Back Pay Act even in suits that are not appeals from an administrative determination under any statutorily established appeal procedure," *id.* at 1272, this can scarcely be taken to mean that appellants can circumvent a statutorily prescribed appeal procedure designed to address just the sort of claim they present. No such question as to the utilization of administrative procedures was at issue in *Crowley,* inasmuch as the claim in that case arose prior to the effective date of the 1978 amendment to the Back Pay Act; indeed, the Government in that case did not even contest the applicability of the Back Pay Act. *Id.* at 1272–73.

## III

Due to the potential availability of relief from the Office of Special Counsel and by virtue of this court's decision in *Carducci*, we agree with the District Court that it lacked subject matter jurisdiction over most of these claims. In addition, we agree with the District Court that appellants' constitutional claim is moot (or premature) and that the claim for back pay is, at best, premature.

For the foregoing reasons, the judgment of the District Court is

*Affirmed.*