William S. BARNHART, et al., Appellants,

v.

Donald DEVINE, Director, OPM, et al.

No. 83–2324.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 30, 1985.

Decided Aug. 9, 1985.

As Amended Aug. 27, 1985.

**1516**

George M. Chuzi, Washington, D.C., with whom June D.W. Kalijarvi, Washington, D.C., was on the brief, for appellants.

John W. Polk, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on the brief for appellees.

Before ROBINSON, Chief Judge, STARR, Circuit Judge, and BRYANT, District Judge *.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This appeal requires us again to determine the effect of the Civil Service Reform Act of 1978 on the proper procedure for obtaining review of an agency personnel action challenged by a federal employee. The case arose out of a petition filed by several employees of the Department of Commerce's National Weather Service, requesting that a position-to-position comparison be conducted to determine whether those employees were performing substantially the same work as other National Weather Service employees classified at a higher General Service ("GS") level. The Office of Personnel Management refused to comply with appellants' request on the ground, among others, that OPM was not obliged to make position-to-position comparisons. OPM maintained that it was required only to compare appellants' position to the pertinent classification standard promulgated pursuant to the Classification Act, 5 U.S.C. §§ 5101 *et seq.* (1982), and that appellants' GS rating conformed to the applicable standard promulgated under that statute.

Thus stymied in their quest for reclassification, the National Weather Service employees brought a mandamus action in federal district court seeking to compel the Department of Commerce and OPM to make the position-to-position comparison with other National Weather Service employees. The District Court dismissed the petition on the ground that an alternative avenue of relief had not been pursued, thereby vitiating any warrant for the extraordinary judicial remedy of mandamus. In the District Court's view, the gravamen of appellants' complaint was that the Department of Commerce and OPM had en-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursu-ant to 28 U.S.C. § 292(a).

gaged in a a "prohibited personnel practice," as defined by the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 111 (codified as amended in scattered sections of 5 U.S.C. (1982)) ("CSRA"), and that, in consequence, the employees were required to present their grievance to the Office of Special Counsel, an entity created by the CSRA to investigate federal civil service employees' complaints and to bring meritorious claims before the Merit Systems Protection Board. The District Court further concluded that appellants' mandamus petition would properly lie only against the Office of Special Counsel, if that entity unjustifiably failed or refused to carry out its responsibility to determine whether reasonable grounds supported their allegations. We agree with the District Court's analysis and therefore affirm.

I

Appellants are employed by the National Weather Service as GS–12 Area Electronics Supervisors ("AES's"). Of forty-five purported class members, sixteen of whom are named plaintiffs in this action, only two—appellants Wilson and Barnhart—filed classification appeals with either the Department of Commerce or OPM challenging the propriety of classifying some AES's at GS–12 while classifying others at GS–13.

First, as to Mr. Wilson: from his place of employ in Omaha, Nebraska, Mr. Wilson filed a classification appeal in August 1979 with the National Weather Service requesting that his grade of GS–12 be increased to GS–13. He specifically requested a position-to-position comparison between his position and that of a GS–13 AES in Kansas City, Missouri, which Mr. Wilson asserted involved the same functions. The Department of Commerce refused to make the requested comparison and denied the appeal. Mr. Wilson thereafter appealed to OPM, contending that the Department had failed properly to implement OPM's classification standards. OPM likewise denied Mr. Wilson's appeal on the ground that his position description met the general standards for a GS–12 rating, not GS–13. In

reaching this conclusion, OPM stated, to Mr. Wilson's chagrin, that the classification of another position, such as that of the Omaha GS–13 post, was simply not relevant to determining whether Mr. Wilson was properly classified.

Like Mr. Wilson, William Barnhart is employed as a GS–12 AES, working in the Piedmont at the National Weather Service's Raleigh, North Carolina facility. In November 1979, Mr. Barnhart filed a classification appeal with the Department of Commerce, which was subsequently rejected. Consistent with the agency's treatment of Mr. Wilson's claim, Mr. Barnhart's internal administrative appeal was denied on the grounds that his position could not "be compared to other similar positions for classification purposes" and that his classification was proper based upon a comparison of his position "with the appropriate OPM published classification standard." Joint Appendix ("J.A.") at 118–19.

Mr. Barnhart appealed to OPM contending (1) that his present position description did not accurately describe his actual duties, and (2) that a comparison of his duties with those of a GS–13 AES would reveal that the two positions were substantially the same. After first dismissing his appeal as premature, OPM ultimately denied relief on the ground that a position-to-position comparison "is not a valid means of classifying positions" inasmuch as the comparison position itself may not be properly classified. J.A. at 126.

Subsequently, Mr. Barnhart engaged legal counsel who crafted a new analytical approach; specifically, counsel in January 1982 requested OPM to investigate whether the National Weather Service was violating the Classification Act (as well as the CSRA) in failing to adhere to the merit system principle of equal pay for substantially equal work. J.A. at 128. Thus, what had been a rather abstract dispute over Classification Act principles evolved into a specific claim that, by permitting the alleged condition of disparate classifications for similar jobs, the Department of Commerce had set its face against the equal-

protection principles embodied in the civil service merit system. OPM nonetheless declined to investigate this reshaped allegation by virtue of Mr. Barnhart's having "bypassed the Region [OPM's Southeast Regional Office] and ... [having] failed to provide the documentation required by ... the Federal Personnel Manual." J.A. at 131. Mr. Barnhart did not thereafter attempt either to appeal to the Southeast Regional Office or to supply the required documentation.[1]

In August 1982, appellants joined forces and filed a petition for a writ of mandamus in District Court. Subsequently, appellants filed a motion for class certification which was denied in April 1983.[2] Thereafter, the parties filed cross motions for summary judgment. In addition, appellees filed a motion to dismiss contending that, pursuant to this court's decision in *Carducci v. Regan*, 714 F.2d 171 (D.C.Cir.1983) (concluding, among other things, that "prohibited personnel practice" complaints must be processed through the Office of Special Counsel), the District Court lacked subject matter jurisdiction over the case. In December 1983, the District Court granted the motion to dismiss, concluding that under *Carducci*'s teaching, appellants were required to file their complaint with the Office of Special Counsel which, upon a finding that reasonable grounds existed to believe that a "prohibited personnel practice" had occurred, could "seek correction"

from the Merit Systems Protection Board. J.A. at 13 (quoting *Cutts v. Fowler*, 692 F.2d 138, 140 (D.C.Cir.1982)). The District Court determined that the gravamen of appellants' claim was that the Department of Commerce and OPM had allegedly violated the Classification Act, a law which directly concerns the merit system principle of "[e]qual pay ... for work of equal value." 5 U.S.C. § 2301(b)(3), *quoted in* J.A. at 14. Relying on the premise that any personnel action which violates a law embodying a merit system principle constitutes a prohibited personnel practice,[3] the District Court held that appellants were required under *Carducci* to bring their claim in the first instance to the Office of Special Counsel; limited judicial review of the adequacy of the Special Counsel's inquiry would subsequently be available to an aggrieved employee. J.A. at 15. The District Court held that, inasmuch as the court's function "is limited to insuring that the OSC fulfills its statutory responsibility" and that "the OSC has not even been asked to investigate plaintiffs' claims," the court was without subject matter jurisdiction. *Id.*

## II

The broad contention on appeal is that the District Court erred in dismissing the mandamus petition; to reach this conclusion, appellants specifically contend (1) that OPM has exclusive jurisdiction over ap-

---

**1.** In light of this procedural wrinkle, appellees argue with some force that mandamus cannot lie with respect to Mr. Barnhart's appeal since he failed fully to exhaust his administrative remedies. Mr. Barnhart responds that any failure to exhaust his appeal by complying with OPM's direction to proceed through the Southeast Regional Office and to supply additional documentation does not defeat his right to petition for mandamus inasmuch as these steps would merely have been *pro forma;* OPM, he pointed out, had already categorically refused to perform the requested comparison. We need not resolve the issue of Mr. Barnhart's failure *vel non* to exhaust his OPM appeal in order to decide this case inasmuch as *Mr. Wilson* indisputably exhausted his OPM appeal. Thus, without deciding the question, we will assume *arguendo* that both appellants exhausted their OPM appeals.

**2.** Inasmuch as our finding of lack of subject matter jurisdiction necessarily ends our inquiry, we do not discuss in detail the propriety of appellants' motion for class certification or the District Court's denial of that motion.

**3.** *See* 5 U.S.C. § 2302(b)(11) (1982). By definition, a "personnel action" includes "[a] decision concerning pay." 5 C.F.R. § 1250.3(a)(9) (1985). A personnel action becomes a "prohibited personnel practice" whenever "an employee who has authority to take, direct others to take, recommend, or approve any personnel action" does so in violation of "any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in 5 U.S.C. 2301." *Id.* § 1250.3(b)(11); *see also infra* note 8.

peals from agency classification determinations, and (2) that nothing in the CSRA alters appellants' preexisting right to seek to mandamus the Department of Commerce and OPM to carry out a function which, appellants claim, the Classification Act requires those agencies to perform.[4] In addition, appellants argue that their claim "arises independently of the CSRA" because it is brought under a separate statute, the Classification Act, and therefore the CSRA (by means of the Special Counsel) is not the exclusive remedial avenue for employees adversely affected by a classification decision. Finally, appellants claim that filing a complaint with the Office of Special Counsel is not a prerequisite to seeking a writ of mandamus for the simple reason that the procedures of that Office do not constitute an efficacious remedy. In appellants' view, the Special Counsel could do nothing more than request OPM to do that which OPM has already categorically refused to do, namely to perform position-to-position comparisons.

### A

Appellants' first line of argument rests upon the Classification Act's grant of authority to OPM (1) to establish classification standards and (2) to police federal agencies to ensure that those standards are properly implemented. Appellants contend that OPM has exclusive authority to render final decisions respecting matters of classification. All they are seeking, appellants argue, is a comparison of their GS–12 positions to the positions of other Area Electronic Supervisors whom appellants believe are receiving higher pay while performing duties substantially similar to those being discharged by appellants. As they conceptualize their case, appellants view their complaint as involving a classification matter solely within the province of OPM; under this theory of the case, appellants ar-

gue that they need not seek recourse elsewhere within the Executive Branch, but rather that repair was properly had to the United States Courthouse.

To evaluate fully appellants' argument, we must return to the statutory setting which existed prior to the CSRA's passage and then examine the CSRA's statutory scheme as it bears on appellants' complaint. While this is familiar terrain, a full analysis requires more than a leisurely stroll through the administrative precincts of the civil service system. A careful review of the statutory background—and present civil service system—is mandated in light of what seems in retrospect to have been considerable uncertainty as to the precise operation of that system with respect to questions of classification.

Our journey back in time begins in 1949, when Congress enacted the Classification Act. That statute vested in the old Civil Service Commission ("CSC" or "Commission"), and now vests in OPM, the responsibility to draft classification standards, 5 U.S.C. § 5105 (1982), and to review agency compliance with those standards, 5 U.S.C. § 5110(a) (1982). Under the classification system as originally conceived, each agency was responsible for applying the general classification standards in classifying its own employees. If the Civil Service Commission determined that a particular position had been improperly classified by an employing agency, the Commission issued a certificate reclassifying the position; as was true then and now, "the certificate [of the Commission, and now OPM] is binding on all administrative, certifying, payroll, disbursing, and accounting officials." 5 U.S.C. § 5110(b) (1982). The system continues to operate in the same manner, except of course OPM, not the now-defunct Civil Service Commission, makes the classification determinations and issues certificates.

4. We observe at this juncture that it would be premature and is thus unnecessary for us to decide whether appellants' action before the OSC would more properly lie against OPM or the Department of Commerce. We express no opinion as to whether OPM could properly be named as a respondent in any proceeding before the MSPB. It appears, however, that the Director of OPM frequently participates in Board proceedings through an exercise of the Director's right to intervene. *See* 5 C.F.R. § 1201.34(b)(1) (1985).

At the time the Classification Act was enacted, only a single agency—the Civil Service Commission—was responsible both for drafting the initial classification standards and then hearing appeals in specific cases from the various agencies which applied and implemented the standards. The CSC appeals procedure was in the nature of an internal audit; it did not provide for a hearing "or for any outside third party review."[5] In crafting a reform regime, the framers of the Civil Service Reform Act in the late 1970's viewed this lack of "minimal procedural guarantees," as well as the perceived inherent conflict between the CSC's role as administrator of the civil service system and its role in protecting that system from abuse, as primary reasons for substantially altering the system.[6] Repeatedly throughout the hearings on the Civil Service Reform Act, members of Congress expressed concern that the new system be viewed as fair to employees and that it not discourage "whistleblowing." These goals, Congress concluded, could not be accomplished so long as the same body was responsible "for both the management of the civil service system and adjudication of complaints against the way the system is implemented." 124 CONG.REC. S14,268 (1978) (Statement of Sen. Ribicoff), *reprinted in* LEGISLATIVE HISTORY, *supra* note 5, at 1608. Thus, as is now well known, Congress, in enacting the CSRA, abolished the Civil Service Commission and divided the civil service functions among three newly-created bodies. Those entities, which we shall now very briefly describe, are already well recognized actors on the civil-service stage.

The Office of Personnel Management was established to assume "the ... leadership functions in the field of personnel administration [formerly] assigned to the Commission but more properly the function of the Chief Executive." 124 CONG.REC. S14,278 (1978) (Statement of Sen. Sasser), *reprinted in* LEGISLATIVE HISTORY, *supra* note 5, at 1629.[7] The Merit Systems Protection Board, on the other hand, was established to assume the "watchdog role" of the Commission by which it would serve as protector of the merit system principles. *Id.; see* 5 U.S.C. §§ 1201 *et seq.* (1982). The MSPB was given authority to adjudicate any claim asserting that an agency had violated a merit system principle or committed a "prohibited personnel practice" by violating a statute which embodied any merit system principle.[8] *See id.* § 1205.

In order to avoid problems similar to those experienced with the CSC, Congress separated the prosecutorial arm from the adjudicatory apparatus of the MSPB, creating an independent Office of Special Counsel to investigate charges and to bring complaints before the MSBP.[9] *See id.* § 1206.

---

**5.** 124 CONG.REC. H8468 (1978) (Statement of Rep. Ford), *reprinted in* HOUSE COMM. ON POST OFFICE AND CIVIL SERVICE, 96th CONG., 1st SESS., LEGISLATIVE HISTORY OF THE CIVIL SERVICE REFORM ACT OF 1978, at 814–15 (Comm.Print 1979) [hereinafter cited as LEGISLATIVE HISTORY].

**6.** *Id.*

**7.** The quoted language is taken from a bill introduced in 1958 and again in 1959. The language was later adopted by the 1978 bill's supporters as an accurate expression of the intended function of OPM under the Civil Service Reform Act of 1978.

**8.** The merit system principles, which are codified at 5 U.S.C. § 2301(b) (1982), expressly include protection against arbitrary action, *id.* § 2301(b)(8)(A), require fair and equitable treatment, *id.* § 2301(b)(2), and "[e]qual pay ... for work of equal value," *id.* § 2301(b)(3).

**9.** The Office was created to afford employees a remedial mechanism independent of the civil service system to which they could bring their grievances. *See, e.g., Frazier v. Merit Systems Protection Board,* 672 F.2d 150, 162 (D.C.Cir.1982) (role of OSC is that of ombudsman). The Office of Special Counsel can investigate charges and initiate Board proceedings but it cannot itself grant relief; that ultimate function is entrusted by Congress to the MSPB. To a great degree, therefore, the efficacy of the OSC as a remedy depends upon the efficacy of the MSPB. *Layser v. Department of Agriculture,* 8 MSPB 72, 73 (1981) (relationship of Special Counsel to the MSPB is "that of a prosecuting attorney to a court"). There is, however, one sense in which the OSC can effect a remedy. An agency under OSC investigation has an incentive to settle the matter "out of court," as it were, inasmuch as a Board decision against the agency would obviously impact

In addition, the Office of Special Counsel was granted authority to seek stays for fifteen days (or longer, upon MSPB authorization). *Id.* § 1208. Upon completion of any investigation, the Special Counsel was authorized to make recommendations to the employing agency, *id.* § 1206(c)(1)(A), and require a report from the agency's head with respect to implementation of those recommendations, *id.* § 1206(b)(3)(A)(ii). If the agency fails to cooperate, the Office of Special Counsel can bring the matter before the MSPB, which in turn may issue subpoenas and seek judicial enforcement of the subpoena. *Id.* § 1206(c)(1)(B). In addition, the Special Counsel can "initiate disciplinary action against those who knowingly and willfully violate the merit principles." S.REP. NO. 900, 95th Cong., 2d Sess. (1978), *reprinted in* LEGISLATIVE HISTORY, *supra* note 5, at 1471. *See* 5 U.S.C. § 1206(a)(1) (1982). The sanctions the OSC may recommend to the MSPB range from simple reprimands to demotions, suspensions, removals, debarment from Federal employment for up to five years and fines not to exceed $1,000. *Id.* § 1207(b); *see also* 5 C.F.R. § 1201.-126(c) (1985).

In addition, an interplay pertinent to our case exists between OPM and MSPB. Specifically with respect to OPM, the MSPB was granted oversight authority "to review rules and regulations after they have been issued" either *sua sponte* or at the request of the Office of Special Counsel or any interested party. 124 CONG.REC. H9669 (1978) (Statement of Rep. Fisher), *reprinted in* LEGISLATIVE HISTORY, *supra* note 5, at 1120; *see also* 5 U.S.C. § 1205(e)(1) (1982). If the MSPB finds the rule or regulation to be in violation of merit system principles, the Board can invalidate it. *Id.;* § 1205(e)(2). In order to facilitate the MSPB's oversight function, Congress granted the Board access to agency records, including those of OPM. 124 CONG.REC. S14,270 (1978) (Statement of Sen. Percy), *reprinted in* LEGISLATIVE HISTORY, *supra* note 5, at 1613; *see also* 5 U.S.C. § 1205(d)(3) (1982). Although in most respects OPM is treated like any other agency with respect to MSPB oversight, OPM was singled out for discussion during the Congressional debate on the CSRA for the very reason that this new separation of powers, as it were, represented an integral part of the overall reform of the civil service system. OPM could no longer, as the Civil Service Commission had allegedly done in some instances, manage the civil service system in an arbitrary and capricious manner and then, if challenged, uphold its own action upon review. In a word, it was of especial importance to Congress that OPM's actions be subject to independent review within the Executive Branch.[10]

In addition to pursuing specific OPM personnel matters brought to its attention, the MSPB exercises an evaluative function with respect to OPM by means of an annual report which the Board is required to submit to the President and Congress respecting its own activities as well as "a review of OPM activities which are deemed 'significant.'" H.R.REP. NO. 1717, 95th Cong., 2d Sess. 133 (1978) (Joint Explanatory Statement of the Committee on Conference), *reprinted in* LEGISLATIVE HISTORY, *supra* note 5, at 1975. This reporting requirement includes "an analysis of whether the actions of the Office of Personnel Management are in accord with merit system principles and free from prohibited personnel practices." 5 U.S.C. § 1209(b) (1982). The Conference Committee Report explains in this respect that the MSPB should not *"in connection with the annu-*

---

upon the agency's relationship with its employees in a way that settlement of the matter at the investigatory stage would not. In the latter case, the agency is obviously seen as taking an initiative in correcting abuses once they are brought to light by means of the OSC's investigation.

10. *See, e.g.,* S.REP. NO. 969, 95th Cong., 2d Sess. 24 (1978), *reprinted in* LEGISLATIVE HISTORY, *supra* note 6, at 1488; 124 CONG.REC. S14,268, S14,279–80, S14,282 (1978) (Statements of Sens. Ribicoff, Sasser and, again, Sasser, respectively), *reprinted in* LEGISLATIVE HISTORY, *supra* note 5, at 1608, 1630–32, 1636.

*al report,* conduct an investigation into all internal operations of OPM." H.R.Rep. No. 1717, 95th Cong., 2d Sess. 133 (1978) (Joint Explanatory Statement of the Committee on Conference), *reprinted in* LEGISLATIVE HISTORY, *supra* note 5, at 1975 (emphasis added). The clear import of all this is that an MSPB investigation may be warranted in other contexts, such as when an employee alleges that OPM is engaging in a "prohibited personal practice."

Now to return to the Classification Act and how that statute fits into the post-CSRA structure. Among OPM's functions are the duties imposed by the Classification Act, which we reviewed briefly above. As a technical amendment to the CSRA, Congress amended the Classification Act to substitute "Office of Personnel Management" for "Civil Service Commission." Technical and Conforming Amendments to Pub.L. No. 95–454, 92 Stat. 1226 (CSRA) Oct. 13, 1978 (amending 5 U.S.C. § 5112). It appears that Congress merely intended to substitute either "OPM" or "MSPB" wherever "CSC" appeared in a statute, whichever appeared most appropriate, without reconsidering individually each and every statute impacting on the civil service system. As classification represents, in the first instance, the sort of managerial and administrative function that Congress entrusted to OPM, "OPM" was, accordingly, substituted for "CSC" in the Classification Act.

In view of all this, appellants urge to us that OPM now enjoys, as the CSC had previously, the final word on matters of classification; absent an abuse of discretion, appellants argue, OPM's classification determinations cannot be overturned.[11] Appellants base their position upon sections 5110(b) and 5112(a) of the Classification Act, which as we have already observed provide that once OPM places a position "in its appropriate class and grade," OPM is then to certify this action to the agency, which, in turn, "[is required to] act in accordance with the certificate, and the certificate is thereafter binding," 5 U.S.C. §§ 5110(b), 5112(a) (1982). *See supra* page 1519. In a word, appellants maintain that once OPM has spoken in matters of classification, the apparatus of the Executive Branch comes to rest, and repair can then only be had to the Third Branch.

Upon analysis, appellants' argument is not at all unreasonable, but we conclude, after careful study, that it no longer rings true in this, the post-CSRA world. Although prior to the CSRA's passage, this description would seemingly have been accurate, leaving the courts as the sole avenue of review for persons aggrieved by adverse classification decisions by the old Civil Service Commission, this situation seems to us no longer to obtain. The statutory language which we quoted above was enacted prior to creation of the MSPB; even a very prescient Congress in crafting the Classification Act during the Presidency of Harry Truman could scarcely have contemplated the dispersal of functions three decades later to entities not even extant in 1949.

More fundamentally, to hold that the MSPB is irrevocably bound by an OPM classification decision would seriously undermine an important structural principle embodied in the CSRA. In fashioning that watershed statute, Congress clearly intended that MSPB would carry out a detached, quasi-judicial function. It was for this very reason that Congress provided for Presidential appointment of the three Board members, with the advice and con-

---

**11.** Appellants support this argument by observing that OPM has itself taken this position before the First Circuit. In *Dugan v. Ramsay,* 727 F.2d 192 (1st Cir.1984), OPM asserted in a supplemental brief that "the 'corrective action authority of the Special Counsel does not have "anything to do" with [the] appeal right of individual employees for grievances . . . .'" 727 F.2d at 194. We find this language to suggest nothing more than that, *absent* allegations of a *pro-hibited personnel practice,* OPM classification determinations are final. We observe that our characterization more accurately describes the position taken by OPM in this case and by the Office of Special Counsel in *Gray v. OPM,* 771 F.2d 1504 (handed down on the same day as the instant case). *See* Appellants' Brief filed in *Barnhart* at 14; *see also* Letter from OSC to Appellants' counsel, Exhibit F to Appellants' Reply Brief filed in *Gray.*

sent of the Senate, "not more than 2 of whom may be adherents of the same political party." 5 U.S.C. § 1201 (Supp.1985). In this way, Congress sought, as we have seen, to avoid the conflict that arose when the same administrative body that managed the civil service system, including the establishment of its classification standards, also heard appeals from adverse classification determinations. Inasmuch as the level of compensation is, in large part, a function of classification, the manager of the civil service system has "a vested interest in keeping grades [*i.e.*, classifications] down." 124 Cong.Rec. H8468 (1978) (Statement of Rep. Ford), *reprinted in* Legislative History, *supra* note 5, at 815. Thus, it was crucial to the CSRA's scheme that the independent, quasi-judicial body established by that statute—MSPB—be available to adjudicate classification appeals.

■ In light of the clearly manifested Congressional intent embodied in the CSRA, we conclude that a distinction must be drawn between classification determinations by OPM which bind the MSPB in the sense that the MSPB is an employer like any other employer, on the one hand, and, on the other hand, classification determinations that reach the MSPB through the investigatory apparatus of the CSRA. That is to say, whenever OPM determines that a particular job description should be classified under a particular GS level, that determination applies across the board to all agencies employing persons with a similar job description. However, whenever an agency, in the process of implementing a classification standard, allegedly violates a statute embodying a merit system principle and thereby commits a "prohibited personnel practice," [12] it matters not at all that the adverse determination from which the employee appeals is a classification matter; for, in granting the MSPB authority to conduct adjudicatory proceedings respecting violations of merit system principles,

Congress plainly intended to empower the MSPB to police all agencies and to be the final administrative word respecting prohibited personnel practices, even in the context of classification determinations.

■ To return now from structural considerations to the chapter and verse of the operative statute, the Congressionally granted powers and functions of the MSPB include the review of rules and regulations promulgated by OPM. 5 U.S.C. § 1205(a) (Supp.1985). The review provision *does not by its terms exclude* review of classification rules or regulations; to the contrary, they appear to fall within the ambit of "any rule or regulation issued by the Director in carrying out his functions under section 1103 of this title." *Id.* § 1205(e)(1). Section 1103, in turn, details the functions of the Director of OPM; included among those functions are "classification activities." *Id.* § 1103(a)(5)(B). In a word, if upon review, the MSPB determines that a classification rule or regulation is on its face invalid or invalid as implemented by a particular agency, it may, in the former instance, *invalidate the rule or regulation* or, in the latter instance, take corrective action against the employing agency. It thus appears that the MSPB may render classification decisions pursuant not only to its authority to hear petitions involving allegations of "prohibited personnel practices," but also by virtue of its authority to review OPM rules and regulations.

## B

As an additional argument, appellants contend that, despite the intervening passage of the Civil Service Reform Act, mandamus is still available to remedy situations in which OPM refuses to perform a ministerial act which it is required by law to perform. Appellants argue that by virtue of this court's decision in *Haneke v. Secretary of Health, Education, and Wel-*

---

**12.** In order to establish the occurrence of a prohibited personnel practice, "[i]t must be shown by a two-step analysis that the action (i) violates a law, rule, or regulation, and (ii) that the violated law, rule, or regulation is one which 'implements' or which 'directly concerns' the merit system principles." *Wells v. Harris,* 1 MSPB 199, 204, 1 MSPR 208, 215 (1979) (quoting 5 C.F.R. § 1250.3(b)(11) (1985)). *See supra* note 3.

*fare,* 535 F.2d 1291 (D.C.Cir.1976), OPM, as successor to the Civil Service Commission, is *required* to perform position-to-position comparisons;[13] thus, appellants argue, such a comparison constitutes a ministerial act. The argument further runs that mandamus is the appropriate judicial vehicle by which to proceed, inasmuch as the requested comparison is a ministerial function that the Department of Commerce and OPM are both required to carry out but which each has studiously refused to perform. Citing this court's decision in *Wren v. MSPB,* 681 F.2d 867, 875 n. 9 (D.C.Cir.1982), appellants conclude that mandamus is still available despite passage of the CSRA.

■ We cannot agree with appellants' understanding either of the function of mandamus or the role of the Office of Special Counsel. It is, of course, elementary that mandamus is an extraordinary form of relief which lies only when no adequate alternative remedy exists. *See, e.g., Allied Chemical Corp. v. Daiflon,* 449 U.S. 33, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980); *see also In re GTE Service Corp.,* 762 F.2d 1024, 1026 (D.C.Cir.1985); *Cartier v. Secretary of State,* 506 F.2d 191, 199 (D.C.Cir. 1974). As we have been, OPM is not the exclusive remedial situs for employees

faced with adverse classification determinations.[14] Appellants could have and should have sought recourse through the Office of Special Counsel. Had the Special Counsel utterly failed to take action, mandamus would then lie to compel that Office to perform its statutory duty.[15] In *Wren v. Merit Systems Protection Board,* 681 F.2d 867 (D.C.Cir.1982), this court observed that

> "[d]espite substantial precedent to the effect that federal mandamus does not ordinarily lie under 28 U.S.C. § 1361 to compel prosecutions or even investigation ... we cannot so easily conclude that Congress meant to provide no means to enforce the OSC's failure to perform a ministerial duty, *i.e.,* to investigate or to screen to some degree employee complaints which allege prohibited personnel practices. The CSRA contains an unequivocal statutory mandate, incorporated into the OSC's own regulations, [requiring that the Special Counsel] 'receive and ... investigate allegations of prohibited personnel practices.'"

*Id.* at 875–76 n. 9 (citations omitted). This court's decision in *Wren* does not stand for the proposition, as appellants would have it, that the Office of Special Counsel can be circumvented by means of mandamus against the allegedly errant agency.[16] Nor

**13.** Inasmuch as an employing agency makes initial classification determinations, this requirement would likewise apply to the employing agency, in this case the Department of Commerce. *See* 5 U.S.C. §§ 5107, 5112 (1982).

**14.** Appellants rely upon this court's decision in *Atwell v. MSPB,* 670 F.2d 272 (D.C.Cir.1981), to support their contention that the OSC has no authority over classification matters. Appellants' reliance is misplaced. The precise holding in *Atwell* is that reductions in grade which trigger the grade and salary retention benefits of 5 U.S.C. § 5366(b)(1) (1982) are not adverse actions *directly* appealable to the MSPB pursuant to 5 U.S.C. § 7512. Under the CSRA, only "adverse actions" are directly appealable to the MSPB; lesser personnel actions must be screened by the Office of Special Counsel.

**15.** We need not here plumb the procedural depths of whether, under the particular statutory structure of the CSRA and the Classification Act, mandamus jurisdiction would lie with the District Court pursuant to the Mandamus Act, 28 U.S.C. § 1361 (1982), or with the Federal Circuit pursuant to the Federal Courts Improve-

ment Act, 5 U.S.C. § 7703(b)(1) (1982). *See Telecommunications Research & Action Center v. FCC,* 750 F.2d 70 (D.C.Cir.1984).

**16.** In *Carducci v. Regan,* 714 F.2d 171 (D.C.Cir. 1983), which we discussed previously, this court considered the impact of the CSRA on the availability of alternative remedies for aggrieved civil servants. Although *Carducci* involved an action purportedly brought under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (1982), not under the Mandamus Act, 28 U.S.C. § 1361 (1982), and the action complained of did not constitute a prohibited personnel practice, the opinion nonetheless contains instructive language relevant to our case. In finding that the challenged action was committed by law to agency discretion, the court in *Carducci* observed:

> [T]he exhaustive remedial scheme of the CSRA would be impermissibly frustrated by permitting, for lesser personnel actions not involving constitutional claims, an access to the courts more immediate and direct than the statute provides with regard to major adverse actions.

does *Wren* stand for the extraordinary notion that mandamus would still be available to a complaining civil servant even though the potential avenue of relief afforded by the Office of Special Counsel had not been invoked. The only situation under which this state of affairs could obtain, it seems to us, is if the Office of Special Counsel procedure constituted, as appellants argue, an inadequate remedy. We turn now, as the final step in our analysis, to consider appellants' assertion that the Office of Special Counsel route would have been, at least in their case, inefficacious.

## C

Appellants briefly set forth several bases for their position that Congress could not have intended the Special Counsel to be "a replacement for the court's mandamus jurisdiction." Appellants' Brief at 26. Appellants contend, first, that "an employee is not obligated to file a complaint, and the nature of the inquiry conducted [by OSC] on the complaint is entirely discretionary." *Id.* It is, of course, true that an employee is not required to file a complaint in the obvious sense that no one is *required* to seek redress of his or her grievance; but to state this self-evident proposition is emphatically not to say that if an employee does seek redress he or she is not required to utilize the proper procedures. Furthermore, although the *nature* of the Special Counsel's inquiry is discretionary, the OSC cannot conduct, under the guise of an exercise of discretion, either an entirely inadequate inquiry or none at all. As this

court observed in *Carducci v. Regan,* 714 F.2d 171, 175 (D.C.Cir.1983), limited judicial review is available to determine whether the Office of Special Counsel has complied with its statutory duty to conduct an investigation into allegations of "prohibited personnel practices." Furthermore, as we have already observed, this court stated in *Wren* that even the extraordinary remedy of mandamus would be available to compel the Office of Special Counsel to perform its statutory responsibilities. *See Wren, supra,* 681 F.2d at 875 n. 9. Appellants' first argument is thus of no avail.

Next, appellants suggest that the Office of Special Counsel "lacks the power to enforce [its] decision." Appellants' Brief at 26. Appellants are quite correct in this respect; the Special Counsel indeed lacks authority to compel compliance with its requests and recommendations. But at the same time, and critically for our analysis, the Office of Special Counsel, as appellants concede, may "petition the Board for enforcement." *Id.* We can find nothing remarkable about this fact,[17] inasmuch as the Special Counsel's role is essentially that of a prosecutor, *see supra* note 9; that Office naturally retains discretion to determine whether an appeal is meritorious and should be brought to the Board's attention. As we have also seen, however, the Special Counsel does not possess absolute discretion regarding whether to undertake any investigation at all to determine whether a federal employee's complaint is meritorious.[18]

---

714 F.2d at 174. That principle is not without applicability to the instant case. Even major personnel actions, referred to as "adverse actions," must go through "extensive prior administrative proceedings" before judicial review is available. *Id.* at 175. While appellants are seeking an order requiring OPM to engage in the classification review, as opposed to challenging substantive agency action, their resort to extraordinary judicial remedies, instead of repairing to the CSRA-provided remedial scheme, similarly works a frustration of Congress' carefully designed plan.

**17.** This structure is hardly unique in federal administrative law; the NLRB, for example, is not empowered to enforce its decisions but rath-

er must seek a court order of enforcement. *See* 29 U.S.C. §§ 160, 161 (1982). Moreover, while the Office of Special Counsel is likewise without authority to enforce its orders, that Office cannot properly be viewed in isolation; it is, rather, part of a larger remedial apparatus which encompasses the MSPB. And the MSPB, unlike the NLRB, enjoys authority to issue binding orders, without first having to repair to federal court. *See* 5 U.S.C. §§ 5110, 5112 (1982).

**18.** Section 1206 of the CSRA requires the Special Counsel to conduct an investigation into "any allegation of a prohibited personnel practice ... to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has oc-

◼ Appellants next contend that under *Borrell v. United States Int'l Communications Agency*, 682 F.2d 981, 984–84 (D.C. Cir.1982), "the employee may not seek judicial review of the Special Counsel's decision." Appellants' Brief at 26–27. Appellants' reliance on *Borrell* is woefully misplaced. The portion of *Borrell* which they cite is not even the court's language, much less the articulation of its decision; the citation, rather, refers us to a letter by the Special Counsel quoted by the court in explaining the facts and procedural posture of that case. Furthermore, the letter describes the procedures for an OSC petition to the Board for a *stay* pursuant to 5 U.S.C. § 1208 (1982). Viewed in proper context, this language from *Borrell* suggests nothing more than the Special Counsel's own view that the CSRA does not provide for judicial review of that Office's determination not to seek a stay pending the outcome of OSC's own investigation.[19] In sum, an aggrieved employee may, as we have seen, seek a writ of mandamus to compel the OSC to investigate a complaint and, in addition, may seek limited judicial review of the OSC's determination that the complaint does not merit the Board's consideration. In the latter instance, judicial review is limited to determining whether the Special Counsel's investigation of the complaint constituted an adequate discharge of the Office's responsibilities under the CSRA. *See Carducci, supra*, 714 F.2d at 175 (citing *Cutts, supra*, 692 F.2d at 140). While limited, that review nonetheless enables the court to determine whether the Office of Special Counsel had adequate information upon which to base its determination.[20]

As their final argument in this respect, appellants contend that, according to this court's decision in *Borrell*, the Office of Special Counsel "is not an adequate ... substitute for a prior judicial cause of action." Appellants' Brief at 27 (citing *Borrell, supra*, 682 F.2d at 990). Once again, appellants have isolated language from *Borrell* which is so removed from its context as to render its use mildly disingenuous. The *Borrell* court decided that, with respect to *constitutional* claims, the Special Counsel does not constitute an adequate alternative to a pre-existing right of judicial review. 682 F.2d at 990. Studying the legislative history of the CSRA, the court there determined that in the absence of a "clear signal ... that Congress meant to deprive appellant of the only cause of

curred, exists, or is to be taken." 5 U.S.C. § 1206(a)(1) (1982).

**19.** This is equally true of appellants' statement that "an employee is not a party to any Special Counsel proceeding before the Board." Appellants' Brief at 26. Although the OSC's letter quoted in *Borrell* does state that "the employee is not a party to the proceeding," *Borrell, supra*, 682 F.2d at 985, "the proceeding" referred to in the letter is, again, the proceeding before the Board in which the OSC requests a stay. Appellants' statement is thus much too broad; it suggests that the employee can never be a party to a proceeding before the Board. That is simply not true. An employee can become a party by intervening in the Board proceeding and can thereby participate in the proceedings on those issues affecting him. *See* 5 C.F.R. § 1201.34 (1985). Indeed, the regulations specifically provide that motions "for permission to intervene will be granted where the requestor will be affected directly by the outcome of the proceeding, including any person alleged to have committed a prohibited personnel practice." *Id.* § 1201.34(c)(2). Intervenors are considered full parties except that they do not have an *independent* right to a hearing and, as already observed,

can only participate as to issues that affect them. *Id.* § 1201.34(d).

**20.** Pursuant to its duty to investigate "prohibited personnel practice" complaints, the Office of Special Counsel would be obliged to take into consideration decisions bearing upon the determination of whether a statute embodying a merit system principle has been violated. *See, e.g., Haneke, supra*, 535 F.2d 1291 (D.C.Cir.1976). *Haneke*, of course, was handed down prior to the CSRA's trifurcation of responsibilities previously vested exclusively in the Civil Service Commission. But *Haneke's* teaching with respect to the bedrock requirement of equal pay for equal work and the concomitant requirement that, under certain circumstances, a position-to-position comparison is called for, applies with equal force in the post-CSRA era. Thus, in order properly to evaluate a "prohibited personnel practice" claim founded upon an allegation of unequal pay for the same work, the OSC might well be required to undertake a position-to-position comparison of the type contemplated by *Haneke* on the part of the old CSC.

action which she has to protect her constitutional rights," the Third Branch would not by decisional law eliminate a pre-existing cause of action. *Id.* at 991.

Appellants of course do not advance a constitutional claim, which was the situation in *Borrell.* Nor do appellants adequately explain their pre-existing cause of action. As we have seen, appeal to OPM in classification matters is still an available avenue of redress; that avenue constitutes, however, neither the final nor the sole determination of classification matters involving "prohibited personnel practice" allegations. And, what is more, mandamus jurisdiction has not been rendered entirely unavailable by the CSRA; by providing a new avenue of review, the CSRA altered the point at which mandamus potentially becomes available—the point at which no alternative remedy is available—as well as the entity against which mandamus may lie. Appellants thus fail on two counts: not only do they not allege the elimination of a pre-existing constitutional right of action, but beyond that lofty point they fail to allege the elimination of *any* cause of action, constitutional or otherwise.

At day's end, we find unpersuasive appellants' specific arguments with respect to the asserted inadequacy of the remedy afforded by filing a complaint with the Office of Special Counsel. Moreover, we find no support for appellants' sweeping broadside that the OSC remedy is inefficacious and that their pursuit of it would be merely *pro forma.*[21] Nothing in the statute or in the regulations suggests that the Special Counsel is powerless to correct abuses of the civil service system. On the contrary, Congress clearly intended the OSC to be the watchdog of the merit system, a watchdog which should not be ignored by employees anxious to resort to federal court.

We are satisfied that appellants could have sought to utilize the OSC and that that remedy was potentially efficacious. Appellants' failure to utilize this alternative remedy precludes the availability of a writ of mandamus to compel OPM to make position-to-position comparisons.[22]

*Affirmed.*

Board order enforcing an OSC recommendation.

---

**21.** Appellants' argument that the OSC is inefficacious because it can do nothing more than request that the Department of Commerce and OPM do that which they have categorically refused to do—perform a position-to-position comparison—need not detain us. We are unwilling to assume, as appellants would have us do, that an agency would cavalierly disregard an OSC investigation or, for that matter, a

**22.** At the same time, the apparent uncertainty in the law as to the availability of the OSC's remedial mechanism suggests strongly the appropriateness now of plaintiffs' complaint being tendered to and reviewed by that Office, should plaintiffs so desire.