**Seymour A. KLEIMAN, Appellant,**

v.

**DEPARTMENT OF ENERGY.**

No. 90–5284.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 13, 1992.

Decided Feb. 25, 1992.

Rehearing and Rehearing En Banc
Denied April 28, 1992.

Eric R. Glitzenstein, Washington, D.C., for appellant.

Marina Utgoff Braswell, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, R. Craig Lawrence,

and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before D.H. GINSBURG, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Seymour Kleiman appeals from the district court's judgment dismissing, for want of subject matter jurisdiction, his action to compel the Department of Energy (DOE) to amend its records pursuant to the Privacy Act, 5 U.S.C. § 552a. *Kleiman v. United States Dep't of Energy*, 742 F.Supp. 697 (D.D.C.1990). We conclude that the Privacy Act cannot be read to afford Kleiman the relief he seeks, and so affirm.

DOE employed Kleiman from some time before September 30, 1982, until January 26, 1990. The parties are in agreement that prior to September 30, 1982, Kleiman held the position of "Program Analyst," that the position was correctly classified, and that it carried the grade of GS–14.[1] DOE eliminated this position effective September 30, 1982, as part of a reduction in force, and re-assigned Kleiman to the position of "Paralegal Specialist," which carried the grade of GS–11. On December 12, 1982, DOE re-assigned Kleiman to an essentially identical position in a different sub-office of the agency, and then on February 23, 1989, to a different "Paralegal Specialist" position, requiring somewhat different duties within the same office. His file at DOE contains personnel action forms reciting all of these assignments.

The short of Kleiman's claim is that, from September 30, 1982, until his resignation in 1990, the duties he actually performed for DOE bore no relation to the job descriptions of the positions he officially occupied[2]—that though he carried the title "Paralegal Specialist" he did the work of a "Program Analyst." He alleges that his personnel records are inaccurate because they reflect the title, not the work, and that the inaccuracies have hindered his search for post-governmental employment.

Kleiman brought the alleged inaccuracies to the attention of DOE in January 1989, and apparently requested that his position be reclassified to match his actual assignment.[3] Though the record bears no doc-

---

**1.** A "position" is "the work, consisting of the duties and responsibilities, assignable to an employee" hired to fill that position. 5 U.S.C. § 5102(a)(3). An agency must "classify" each position under its jurisdiction according to standards set by OPM. 5 U.S.C. § 5107. This consists of assigning each position a class. A position's class is determined in light of the subject matter of, difficulty of, and qualifications needed to perform its duties. 5 C.F.R. § 511.101(b), (c). Each class is assigned to a grade, determined in light of the last two criteria, but without reference to the first. 5 C.F.R. § 511.101(d). The grade determines the basic rate of pay for each position. *Id.* OPM's standards are set pursuant to statute, 5 U.S.C. §§ 5104–5106, and OPM independently reviews agencies' classification decisions. 5 U.S.C. § 5110. An agency may re-classify a classified position "[w]hen facts warrant," 5 U.S.C. § 5107, or when an employee who believes his position is misclassified successfully argues the point to the agency or OPM. 5 C.F.R. § 511.607, *infra* note 3.

"Classification" expressly refers to the placing of a position in a class, 5 C.F.R. § 511.101(c); at least as used in OPM's regulations, however, it also implies a concomitant assignment of a grade. *See, e.g.,* 5 C.F.R. § 511.602. In this opinion, we use "classification" to refer to an agency's (or OPM's) decision to place a given position into a particular class.

**2.** Kleiman asserts that although the primary duty of a "Paralegal Specialist" was responding to Freedom of Information Act requests, for most of this time he actually oversaw enforcement of something called the "Tertiary Incentive Crude Oil Program." Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue at 5, ¶ 14 (filed May 7, 1990).

**3.** In so doing, Kleiman was following the prescribed procedures for addressing such a claim. 5 C.F.R. § 511.607 sets forth the steps:

When the accuracy of the official position description is questioned by the employee, the employee will be directed to review this matter with his or her supervisor. If management and the employee cannot resolve their differences informally, the accuracy of the position description should be reviewed in accordance with administrative or negotiated grievance procedures. If the accuracy of the position description cannot be resolved in this manner, the Office *will decide the appeal on the basis of the actual duties and responsibilities assigned by management and performed by the employee.*

ument reporting the decision, this request must have been denied, for in February of that year Kleiman filed an appeal with the Office of Personnel Management (OPM). OPM announced its intention to perform a position classification review, during which it would have assessed the duties Kleiman actually performed and determined the correct classification for a position comprised of such duties. However, in April of 1989 Kleiman withdrew his appeal, and OPM's review never occurred. He did not, however, abandon his objective. In June 1989, he filed with DOE a letter requesting that it amend his records pursuant to the Privacy Act. When DOE denied his request, he filed an appeal with OPM. When that was rejected Kleiman instituted this suit, requesting the district court to "order[ ] defendants to amend plaintiff's personnel file to reflect accurately and completely the actual positions to which plaintiff has been assigned," among other relief. Complaint at 10 (filed Feb. 5, 1990).

5 C.F.R. § 511.607(a)(1) (emphasis added). *See also Barnhart v. Devine,* 771 F.2d 1515, 1523 (D.C.Cir.1985).

Relying on a sentence immediately preceding the above-quoted regulation, which states that "[t]he accuracy of the official position description" is not appealable to OPM, 5 C.F.R. § 511.-607(a)(1), Kleiman asserts that OPM's "classification appeal procedure ... provides *no* opportunity for individuals to correct inaccuracies in personnel-related records, including inaccurate position descriptions." Reply Brief at 7 (emphasis added). This is not correct. What the first sentence takes away, the rest of the section gives back. Rather than rendering an "inaccurate position description" truly "unreviewable," the provision (as can be seen from the language quoted above) merely requires that the matter first be taken up with an employee's supervisor, then through "administrative or negotiated grievance procedures," and then to OPM. To make matters clearer still, § 511.607(b) expressly sets forth those "issues [which] are neither appealable nor reviewable," period. The accuracy of an official position description is not one of them.

**4.** The Privacy Act provides in pertinent part that:

(d) Each agency that maintains a system of records shall—

. . . .

Kleiman argues that his personnel file is not "accurate" within the meaning of the Privacy Act.[4] But Kleiman's—or any other—record can be "accurate" (or inaccurate) only in relation to the state of affairs it is meant to describe. The forms in Kleiman's file describe his assigned position—they state that his job title was "Paralegal Specialist," and list the duties of that position. Kleiman does not contest that was his job title, nor does he contest the description of what this position entails. The records, then, are accurate: they correctly reflect the position to which Kleiman officially was assigned. And while the work Kleiman actually did may have entitled him to be placed in a different category, carrying a different job description (and grade), such "error" is not the stuff of which Privacy Act suits are made. Contrast *Dickson v. OPM,* 828 F.2d 32, 34–35 (D.C.Cir. 1987). As one court put it, "[t]he Privacy Act allows for amendment of factual or historical errors. It is not, however, a vehicle for amending the *judgments* of feder-

(2) permit [an] individual to request amendment of a record pertaining to him and—

. . . .

(B) promptly, either—
(i) make any correction of any portion thereof which the individual believes is not accurate, relevant, timely or complete; or
(ii) inform the individual of its refusal to amend the record in accordance with his request

. . . .

(g)(1) Whenever any agency
(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

. . . .

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual;

. . . .

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.
5 U.S.C. § 552a.

al officials or ... other[s] ... as those judgments are reflected in records maintained by federal agencies." *Rogers v. United States Dep't of Labor*, 607 F.Supp. 697, 699 (N.D.Cal.1985) (emphasis added & citation omitted).

■ The need to read the Privacy Act without doing violence to the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111 (codified throughout Title 5, U.S.C.) (CSRA), supports our conclusion that the former does not encompass this type of claim. This court has refused to allow "the exhaustive remedial scheme of the CSRA" to be "impermissibly frustrated," *Carducci v. Regan*, 714 F.2d 171, 174 (D.C.Cir.1983), by granting litigants, under the aegis of the Privacy Act or otherwise, district court review of personnel decisions judicially unreviewable under the CSRA. *See Hubbard v. United States EPA*, 809 F.2d 1, 4–5 (D.C.Cir.1986), *aff'd in part on other grounds sub nom. Spagnola v. Mathis*, 859 F.2d 223 (D.C.Cir.1988) (en banc); *see also Houlihan v. OPM*, 909 F.2d 383, 385 (9th Cir.1990); *Towers v. Horner*, 791 F.2d 1244 (5th Cir.1986). Taken together, *Carducci* and *Barnhart v. Devine*, 771 F.2d 1515 (D.C.Cir.1985), make clear that a direct challenge to a position classification, brought for the first time in federal district court, would not be authorized under the CSRA. *Barnhart*, 771 F.2d at 1524–26; *Carducci*, 714 F.2d at 174–75. Yet if we were to allow Kleiman to force DOE to amend his records here, we would be authorizing exactly that.

Kleiman protests that "he is not seeking to ... secure judicial review of federal personnel decisions," Reply Brief at 6 (internal quotations omitted), but only "seek[s] to ensure ... that his records accurately and fairly reflect his actual job responsibilities with the federal government." *Id.* at 8. This seems to us a distinction without a difference. First, we are not sure how the agency responding to this sort of Privacy Act request is supposed to ascertain someone's "actual job responsibilities" other than by looking at the relevant "federal personnel decision[ ]" assigning and classifying that individual's position, or

by replicating the procedures used to make the decision itself. Kleiman's apparent answer is that such a determination should be made in a *de novo* review before a district judge. But that was a mechanism Congress did *not* provide to a federal employee contesting a classification decision—a decision that can immediately affect the employee's job title, opportunity for transfer, chance for promotion, or income. It would be strange if Congress nevertheless provided that same cumbersome and expensive mechanism to someone concerned with his possibilities for non-governmental employment. Second, were Kleiman successful, the agency either would have to amend his forms to state he actually had been employed as a Program Analyst, or place another document in his file stating that, in the government's view, the unamended forms were erroneous. Either way, Kleiman would have achieved the same, impermissible result—a collateral attack on the original personnel decision, bypassing the "exhaustive remedial scheme" provided by Congress. *Carducci*, 714 F.2d at 174. *See generally id.* at 173–75; *Barnhart v. Devine*, 771 F.2d at 1521–23, both setting forth the general scheme for administrative and judicial review of federal personnel actions.

Appellant cites *Hubbard* for the proposition that the Privacy Act gives the district court jurisdiction over a damage suit for "an adverse personnel action," Brief for Appellant at 18, quoting *Hubbard*, 809 F.2d at 5. In reviewing the district court's action there, however, *Hubbard* merely "assum[ed] *arguendo* [that] the ... document was inaccurate," 809 F.2d at 3, an assumption we obviously cannot make today. *Hubbard* decided that any hypothetical inaccuracy did not make out a Privacy Act violation because the plaintiff could not show causation. *Id.* at 4, 5. That "causation analysis ... was influenced by [the need] not to read the Privacy Act so as to bring it into conflict with the CSRA," and, no doubt, by the fact that Hubbard's "complaint really allege[d] only a wrongful personnel decision," *id.* at 5. In short, we

think nothing in *Hubbard* can be construed as conflicting with our decision today.[5]

■ All of the foregoing demonstrates that we agree with the district court's reasoning about the scope of the Privacy Act and its interrelation with the CSRA. We disagree, however, with the district court's conclusion that it therefore lacked jurisdiction over the action. "[P]laintiff's statement of his own cause of action shows that it is based upon [federal] law[ ]," *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908), such that it is a "civil action arising under the ... laws ... of the United States." 28 U.S.C. § 1331. Unless "the alleged claim ... clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction," or "wholly insubstantial and frivolous," *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), plaintiff's well-pleaded complaint determines whether his suit "arises under" the laws of the United States for jurisdictional purposes. *Id.* at 681, 66 S.Ct. at 775. The district court therefore should have denied the government's motion to dismiss to the extent that motion argued lack of subject matter jurisdiction. *See* C. WRIGHT, THE LAW OF FEDERAL COURTS 102 (4th ed. 1983). However, the same motion also requested that the action be dismissed under Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief could be granted. Since we hold that the Privacy Act does not afford relief for Kleiman's claims, and since we may affirm on different grounds the judgment of a lower court "if it is correct as a matter of law," *United States v. Garrett*, 720 F.2d 705, 710 (D.C.Cir.1983) (citation omitted), the judgment of the district court is

*Affirmed.*

---

**5.** This harmony also means that nothing we say today should be taken to cast doubt on *Hubbard*'s statement that "the Privacy Act permits a federal job applicant to recover damages for an adverse personnel action *actually caused* by an *inaccurate* or incomplete record." 809 F.2d at 5 (second emphasis added). *Hubbard's* holding was based on the "actually caused" language; ours is grounded in the reading of "accurate." *Cf. Dickson*, 828 F.2d at 34–35; *Rogers*, 607 F.Supp. at 699.